# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

**JP MORGAN TRUST COMPANY,**
**NATIONAL ASSOCIATION, in its capacity**
**as Trustee of the FI Liquidating Trust, on**
**behalf of Farmland Industries, Inc., now**
**known as Reorganized FLI, Inc.,**

   **Plaintiff,**

   **v.**         **Case No.  05-2231-JWL**

**MID-AMERICA PIPELINE COMPANY,**
**et al.,**

   **Defendants.**
_____

## MEMORANDUM AND ORDER

  This lawsuit arises from a dispute regarding pipeline systems which were formerly used to transport blend stocks and natural gas liquids between Conway, Kansas, and an oil refinery formerly owned by Farmland Industries, Inc. located in Coffeyville, Kansas.  Plaintiff JP Morgan Trust Company, National Association, brings this lawsuit in its capacity as the liquidating trustee established under the Chapter 11 bankruptcy reorganization plan of Farmland Industries, Inc., now known as Reorganized FLI, Inc. (Farmland).  Defendant Mid-America Pipeline Company, LLC and its predecessors (Mid-America) previously provided common carrier/public utility service, in part by way of leased capacity on a pipeline owned by defendant Texaco Natural Gas, Inc. (Texaco) extending between Conway and El Dorado, Kansas.  Texaco terminated the lease as of August 31, 2001, and removed the pipeline from

common carrier/public utility service, thus allegedly depriving Farmland of its needed pipeline capacity between Conway and its refinery in Coffeyville.   Texaco subsequently leased, then sold, the pipeline to one or more of the defendant ONEOK entities.   Farmland's complaint asserts various state law contract, antitrust, and tort claims against entities associated with Mid-America, Texaco, and ONEOK.[1]

This matter is presently before the court on the motions of Mid-America, Williams Energy Services (Williams), and the ONEOK defendants to dismiss (Docs. 11, 14, 16 & 19) Farmland's complaint.   In these motions, defendants raise a myriad of arguments in favor of dismissal of Farmland's complaint.   After thoroughly considering the parties' arguments, the court concludes that it will grant the motions in part and deny them in part.   Specifically, the court will deny Mid-America's motion to dismiss Mid-America Pipeline Company (MAPCO). The court will grant Mid-America's motion to dismiss Farmland's claims against Mid-America Pipeline Company, LLC (MAPL) with respect to Farmland's third-party beneficiary and tort claims, and the court will otherwise deny this motion.   The court will grant Williams' motion in its entirety, and deny the ONEOK defendants' motion in its entirety.

## FACTUAL BACKGROUND[2]

---

[1] Farmland voluntarily dismissed its claims against Texaco without prejudice.   *See* Notice of Dismissal of Texaco Without Prejudice (Doc. 47).

[2] This portion of the court's Memorandum and Order recites the well pleaded factual allegations in plaintiff's complaint, which the court accepts as true consistent with the well established standard for evaluating a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6). Insofar as defendants rely on and the court considers facts beyond the pleadings, the court will

2

Farmland's complaint alleges that for more than fifty years it owned and operated a petroleum refinery located in Coffeyville, Kansas.  The refining process for making gasoline, diesel, and the other essential petroleum products requires the efficient blending of crude oil with butanes and other feedstock products which are commonly referred to as "blend stocks" or "NGLs" (natural gas liquids products).  The area in and around Conway, Kansas, is characterized by underground, excavated salt dome storage which is ideal for the storage of blend stocks and NGLs.  These blend stocks and NGLs are brought to Conway from across  the Midwest and stored for later transport to petroleum refineries such as Farmland's Coffeyville refinery.  At all relevant times, pipelines existed that connected these blend stocks and NGLs in storage in Conway with the Coffeyville refinery.  Additionally, the Coffeyville refinery produced blend stocks and NGLs.  When the Coffeyville refinery produced more blend stocks and NGLs than were needed for refining, they were pipelined back to Conway for storage until a later time.

Farmland's blend stocks and NGLs were transported to and from the Coffeyville refinery and Conway through El Dorado, Kansas, via a common carrier, public utility pipeline system that was at all relevant times owned and/or operated by what plaintiff collectively refers to as the "MAP Entities."  These include Mid-America Pipeline Company (MAPCO), a Delaware corporation which was converted in 2002 to Mid-America Pipeline Company, L.L.C. (MAPL) and their predecessor MAPCO Intrastate Pipeline Company (collectively and

discuss those facts below in the Analysis portion of this Memorandum and Order as and when they are pertinent to the court's analysis.

singularly, Mid-America), as well as Williams Energy Services (Williams).    The parties'
business relationship dates back to at least 1982.

    In 1982, Mid-America owned a six-inch diameter pipeline between Conway and El
Dorado, a distance of approximately sixty-six miles.   On July 19, 1982, Mid-America as
"Carrier" and Farmland as "Shipper" entered into a transportation agreement that was intended
to meet Farmland's service demand to transport the blend stocks and NGLs, as well as refined
petroleum products, back and forth between the Coffeyville refinery and El Dorado.   The
agreement called for the construction of an additional pipeline between El Dorado and the
Coffeyville refinery based upon guaranteed revenues paid by Farmland to Mid-America.   The
agreement provided that Mid-America would "construct, maintain, and operate" (1) a pipeline
from El Dorado to Coffeyville with a six-inch diameter pipeline segment and a four-inch
diameter pipeline segment, and (2) a separate six-inch diameter pipeline segment to El Dorado
from Coffeyville.   The agreement set forth a throughput commitment whereby Farmland was
required to pay Mid-America to transport three million barrels each year for ten years even if
Farmland did not transport three million barrels per year.   In the agreement, Mid-America
agreed to transport the product on a "timely and ratable" basis and to file any necessary tariffs
with the Federal Regulatory Commission (FERC) and/or the Kansas Corporation Commission
(KCC) to implement the terms and conditions of the agreement.   The agreement also required
Mid-America to enter into a joint tariff agreement with Kansas Nebraska Pipeline Company
(Kaneb) to provide further pipeline transportation from El Dorado to points on the larger
Kaneb system so that Farmland could transfer its refined petroleum products on the Kaneb

4

system in Kansas, Nebraska, and the Dakotas.   The parties agreed that Mid-America would "operate the pipeline system as a common carrier" to transport petroleum products into and out of Farmland's Coffeyville refinery.   Farmland's complaint alleges that a common carrier operates as a public utility in Kansas, is regulated by the KCC, and has all of the rights and obligations of public service in addition to any private contract obligations.   The agreement required Mid-America to "exercise due diligence . . . to secure all necessary federal, state and local permits and licenses for the construction, operations, and maintenance of the facilities." Mid-America further agreed that while it could assign its rights, no assignment relieved it from any of its obligations under the agreement.

The 1982 agreement between Farmland and Mid-America was amended effective May 1, 1985, and was entirely superseded by a new agreement.   The 1985 agreement provided for the construction of an additional eight-inch pipeline adjacent to the previously constructed Mid-America four-inch pipeline segment in order to provide for Farmland's greatly increased transportation needs.   In the 1985 agreement, Farmland guaranteed to transport five million additional barrels of blend stock, NGLs, and refined petroleum products per year for eight years.   Again, Farmland agreed to a "take-or-pay" contract provision whereby it promised to pay Mid-America for the transportation of five million barrels per year for eight consecutive years regardless of whether Farmland actually transported that volume.   This financial commitment totaled $3.75 million per year, which effectively guaranteed Mid-America the revenue it needed to construct the additional pipeline, operate it, and profit on the investment. The agreement reaffirmed Mid-America's earlier contractual obligation to continue to

5

maintain and operate (1) a six-inch pipeline from El Dorado to near Burden, Kansas (which lies between El Dorado and Coffeyville), and (2) a six-inch pipeline from Coffeyville to El Dorado. Mid-America again agreed to obtain and maintain its FERC, KCC, and joint Kaneb tariffs. The KCC tariff that was made a part of the agreement provided for pipeline transport all the way from Conway to the Coffeyville refinery and then out of the Coffeyville refinery back to El Dorado, where the refined products were transferred into the Kaneb pipeline. In the period encompassed by the 1985 agreement and through August 31, 2001, Mid-America had available to use, and did in fact use, both its owned six-inch pipeline between Conway and El Dorado and pipeline capacity that it leased from Texaco between Conway and El Dorado in order to meet both its private contract and common carrier/public utility obligations. The 1985 agreement again required Mid-America to operate its pipeline system as a common carrier and to "exercise due diligence to secure all necessary federal, state, and local permits and licenses for the construction, operation, and maintenance." Mid-America agreed not to assign or transfer any interest in the pipeline system except to a successor upon sale of substantially all of its assets, but any such succession would not relieve Mid-America from its obligations under the 1985 agreement.

During the period of the 1985 agreement, Farmland transported or paid for the transportation of five million barrels per year, including on occasion 2.8 million to 2.9 million barrels of NGLs from Conway to Coffeyville. At the end of the agreement, Farmland transported the volume for which it previously paid for but did not transport, i.e., the make-up

6

period.   Farmland and Mid-America conducted business pursuant to the 1982 agreement, the 1985 agreement, and certain KCC and FERC tariffs from July 19, 1982, to March 7, 1996.

On December 27, 1994, Farmland filed a complaint with the KCC.   The complaint, as later amended, sought an order directing Mid-America to file rates which were just and reasonable for the transportation of hydrocarbons between Conway and Coffeyville and from Coffeyville to El Dorado.   Farmland's complaint alleges that the KCC has powers and duties imposed by law to regulate public utilities and common carriers and to review and adjust their rates and terms and conditions of service.   As part of the 1994 complaint proceedings, in January of 1996 Mid-America applied for, but was denied, approval by the KCC to abandon service of the six-inch pipeline segment between Coffeyville and El Dorado.

On March 7, 1996, Farmland and Mid-America entered into an agreement settling the 1994 complaint proceedings and all other matters then in controversy before the KCC.   The settlement agreement incorporated a pipeline capacity lease which provided for Farmland's continuing use of the pipeline system between Conway and the Coffeyville refinery.   The 1996 settlement inured to the benefit of Farmland "and any respective successors or permitted assignees."   The March 26, 1996, KCC order approving the settlement determined that Mid-America was a public utility and common carrier operating in Kansas and required certain other applications, accounting procedures, and approvals.   The settlement provided that Farmland had the exclusive right to use the <u>entire outbound</u> capacity of Mid-America's six-inch pipeline between the Coffeyville refinery and El Dorado, pursuant to the terms of the 1996 capacity lease, from January 1, 1997, through December 31, 1999.   The settlement also required Mid-

7

America to provide inbound pipeline capacity from Conway to the Coffeyville refinery for blend stocks and NGLs in amounts to exceed three million barrels annually.   At that time, Farmland was increasing its capacity at the Coffeyville refinery, and therefore it required increased volumes of blend stocks and NGLs.  Mid-America filed a tariff at the KCC that made more than three million barrels per year of inbound pipeline capacity from Conway to the Coffeyville refinery available to Farmland.   The 1996 settlement also provided that Farmland could transport blend stocks and NGLs outbound on the eight-inch pipeline from Coffeyville to Conway.   KCC tariffs were implemented to provide for this transportation.   The 1996 settlement further provided that

> [Mid-America] shall not suspend or abandon service on either the inbound or outbound pipelines . . . during the period from January 1, 1996, through December 31, 1999. . . . Subsequent to December 1999, [Mid-America] will not seek to suspend or abandon service . . . without at least 240 days prior written notice to Farmland except in the event of an emergency suspension.

Settlement and Mutual Release Agreement § 9, at 10.

Pipeline capacity inbound from Conway to the Coffeyville refinery exceeded the three million barrels that was required to meet Mid-America's contractual obligation to Farmland pursuant to the 1996 agreement as well as Mid-America's applicable KCC tariff.   Both the 1996 agreement and the KCC tariff provided for Farmland to receive reduced transportation rates once it surpassed the volume thresholds of one and one-half million barrels and three million barrels, respectively, per year.   In order for Farmland to receive the benefit of its bargain, capacity in excess of three million barrels per year had to be made available.   Mid-

America could not meet its obligations as increased without leasing capacity on Texaco's Conway/El Dorado pipeline.

In 1998, both the 1996 agreement and the applicable KCC tariff were extended to run through 2011. On February 12, 1998, in anticipation of a proposed merger between Williams and Mid-America, Farmland and Williams entered into a letter agreement that required certain amendments to the settlement. In the 1998 letter agreement, Farmland and Williams agreed to file a tariff for the inbound transportation over the pipeline from Conway to the Coffeyville refinery and to provide transportation at the specific rates set out therein through 2012. Under the agreement, the price per barrel of product that Farmland shipped into the Coffeyville refinery became less expensive as the volume increased. Outbound transportation of blend stocks and NGLs on the eight-inch diameter pipeline from the Coffeyville refinery to Conway was continued through 2011 under the terms and conditions of the 1996 capacity lease.

Farmland, Mid-America, and Williams amended the 1996 settlement agreement on September 20, 1999, via an amendment which was effective March 30, 1998. This so-called 1998 agreement amended the 1996 lease, extending the term of the option of Farmland to extend the 1996 capacity lease through December 31, 2012.

As alluded to previously, Texaco provided the MAP Entities with additional capacity from a Texaco-owned six-inch pipeline that extended between Conway and El Dorado. This Texaco pipeline was consistently operated by Mid-America and its predecessor as part of their common carrier and public utility pipeline service in the state of Kansas since 1982. The Texaco pipeline was placed into public service with the full knowledge and approval of Texaco,

9

pursuant to explicit contract provisions of the Texaco/Mid-America pipeline lease. In return, Mid-America collected KCC tariffs for use of the capacity. Farmland and other shippers relied on and benefitted from this additional pipeline capacity for twenty consecutive years, commencing in 1982. Historically, beginning in 1982, Mid-America had leased the Texaco capacity from Texaco's predecessor, Getty Pipeline Company, and all attendant rights and obligations were assumed by Texaco. As a condition of the 1982 pipeline capacity lease, the parties agreed as follows:

> It is understood that Mid-America is a common carrier and shall operate the [Getty/Texaco] pipeline system as a common carrier pipeline. It is agreed that nothing in this Agreement is intended to be or shall be interpreted in contradiction to the duties and obligations of Mid-America as a Common Carrier.

Farmland's complaint alleges that, under K.S.A. § 66-105 a common carrier and public utility includes all pipeline companies and all persons and associations of persons operating such agencies for public use in the conveyance of property within the state. It further alleges that a common carrier operates as a public utility in Kansas, is regulated by the KCC, and has all of the rights and obligations of public service in addition to any private contract obligations, including the duty to meet the service demands of the public and shippers like Farmland.

On August 1, 2001, in contravention of Mid-America's contractual and legal duties to Farmland, Mid-America failed to renew its lease with Texaco or take any other action (such as purchasing the pipeline) to maintain the Texaco pipeline capacity in public utility/common carrier service and available public utility service. With the knowledge and acquiescence of Texaco and Mid-America, more than half of the pipeline capacity available to meet Mid-

10

America's contract obligations to Farmland between Conway and the Coffeyville refinery was eliminated.   Mid-America had the reasonable ability to continue to lease or purchase the Texaco pipeline capacity or buy the Texaco pipeline from Texaco, but it did neither.   Texaco offered to continue the lease with Mid-America and/or sell the pipeline to Mid-America.   Mid-America did not seek or receive approval from the KCC to abandon the Texaco pipeline capacity even though Mid-America had the statutory obligation to do so before the Texaco pipeline capacity could be removed from common carrier/public utility service.   Farmland alleges that when Texaco removed the Texaco pipeline capacity from common carrier/public utility service, Farmland was directly affected and suffered substantial monetary damages. Texaco was fully aware that the capacity of the Texaco pipeline had been dedicated to common carrier/public utility service for twenty years and that Mid-America had the statutory obligation to seek and obtain approval from the KCC before the pipeline capacity could be removed from common carrier/public utility service.

On January 27, 2003, Farmland alleged at the KCC that Texaco leased the Texaco pipeline capacity to a direct or indirect subsidiary of defendant ONEOK, Inc.  On February 14, 2003, Texaco admitted that it leased the Texaco pipeline capacity to a subsidiary of ONEOK. On September 29, 2003, ONEOK filed an answer in the KCC proceedings in which it stated that on or about September 30, 2001, ONEOK caused defendant ONEOK Field Services Company (OFSC) to enter into a lease with Texaco to operate the Texaco pipeline capacity between Conway and El Dorado.  In testimony filed with the KCC on February 9, 2004, ONEOK stated that it caused OFSC to purchase the Texaco pipeline between Conway and El

11

Dorado on or about December 31, 2003.  ONEOK NGL Marketing, L.P. (ONGL) transports NGLs on the Texaco pipeline and also sells its capacity to third parties, thus denying Farmland's use of the pipeline.  ONEOK and OFSC knew that the Texaco pipeline capacity between Conway and El Dorado had been dedicated to common carrier/public utility service for twenty years and that to remove that capacity from common carrier/public utility service would require the prior approval of the KCC.  ONEOK, OFSC, and ONGL knew that Farmland was an intended beneficiary of the Mid-America/Texaco pipeline lease and the Texaco pipeline capacity between Conway and El Dorado.  They knew that Farmland relied upon the lease and the pipeline capacity, and that Farmland would be directly affected and suffer substantial monetary damages upon removal of the pipeline from common carrier/public utility service.  Despite this knowledge, they converted the Texaco pipeline capacity from public to private use.

Based on these allegations, Farmland asserts six claims.  The first of these is a breach of contract claim.  In this claim, Farmland alleges that Mid-America and Williams owed duties and responsibilities to Farmland under the 1998 amended settlement and 1998 amended capacity lease and the documents they incorporated.  Farmland alleges that the Texaco pipeline was not available from September 1, 2001, through March 3, 2004,[3] to partially meet contractual and public service obligations.  According to Farmland, Mid-America unilaterally took actions which made its ability to perform under the contracts impossible.  Thus, Farmland

_____

[3] Farmland sold the Coffeyville refinery on March 3, 2004.

was deprived of its contracted-for inbound and outbound pipeline transportation between Conway and the Coffeyville refinery. It resulted in the unmet contract and public utility/common carrier (public service) demand of Farmland. Additionally, Mid-America abandoned service to Farmland in contravention of the contract terms embodied in the 1996 settlement and transportation agreements as well as the 1998 transportation agreement.

Farmland's second claim is a breach of contract claim as a third-party beneficiary to the Mid-America/Texaco pipeline lease. This claim alleges that Mid-America leased the Texaco pipeline capacity to meet its legal (common carrier/public utility) requirements to fulfill the needs of pipeline shippers such as Farmland, that Mid-America's duty to act as a common carrier was explicitly set out in the lease, and that Farmland was an intended beneficiary of the lease. When Texaco terminated the pipeline capacity lease with Mid-America and thereafter leased and sold the pipeline to OFSC, Texaco unlawfully removed the pipeline capacity from common carrier/public utility service and from meeting Farmland's public service needs. The claim alleges that Texaco and the ONEOK entities knew that Farmland was a beneficiary of the lease, that the pipeline capacity had been dedicated to common carrier/public utility use for twenty years, that the pipeline capacity could not be used for any other purpose absent KCC approval of abandonment of the pipeline capacity from common carrier/public utility service, that KCC did not approve abandonment of the pipeline, and that ONEOK authorized OFSC to lease and purchase the pipeline and ONGL is using the pipeline to which Farmland is lawfully entitled to sell NGLs.

Farmland's third claim is an antitrust claim.   Farmland alleges that Texaco and the ONEOK entities entered into an agreement and combination to remove the Texaco pipeline capacity from public service and to use the pipeline and its capacity to service one refiner (Frontier Oil at El Dorado) in preference and exclusively to the detriment of a competing refiner (Farmland) and to take from the public the right to compete for the transport and sale of blend stocks and NGLs in the Mid-Continent Region, thus eliminating competition in the transportation and sale of commodities.   This arrangement effectively restrained trade in pipeline transportation, substantially increased the costs of one refiner as compared to another, and eliminated competition in the sale of commodities by removing all shippers and commodity sellers from what was previously a common carrier/public utility system available to all.   Mid-America joined in the conspiracy by failing to defend and preserve its continuing use of the pipeline capacity, and instead acquiesced and participated in the combination in restraint of trade.

Farmland's fourth claim is a claim for negligence per se.   In this claim Farmland alleges that Mid-America and Texaco violated public utility law as determined by the KCC by abandoning the pipeline without seeking or receiving authority to do so from the KCC, as is required by Kansas law.   This claim alleges that the legislature has provided Farmland with a private right for a violation of this law under K.S.A. § 66-176.

Farmland's fifth claim is a claim for civil conspiracy which alleges that Mid-America, Texaco, and the ONEOK entities combined to unlawfully remove the Texaco pipeline capacity from public service.   It alleges that they were fully aware that removal of the pipeline capacity

14

would harm Farmland and that their actions resulted in a breach of the lawful duties that Mid-America and Texaco owed to Farmland.

Lastly, Farmland's sixth claim is a claim for bad faith and unfair dealing. This claim alleges that Mid-America had a duty to honor the covenant of good faith and fair dealing inherent in the 1996 settlement and transportation agreements as well as the 1998 transportation agreement. Mid-America held itself out as a common carrier/public utility and was legally obligated to take actions that were required to permit full performance of those agreements by Mid-America, as well as the related common carrier/public utility obligations. Mid-America promised to make capacity and transportation available to Farmland until at least 2011 pursuant to the contracts and related common carrier/public utility obligations, but instead failed to renew the Texaco pipeline capacity lease and/or buy the Texaco pipeline, thus rendering Mid-America unable to meet its contract or common carrier/public utility obligations. In this claim Farmland alleges that the contracts and the related KCC tariffs impose obligations of law, equity, and custom necessary to carry them into effect.

Mid-America, Williams, and the ONEOK defendants now ask the court to dismiss Farmland's complaint. They raise a myriad of arguments in this regard. In analyzing these arguments, the court wishes to emphasize a threshold issue, which is that the court's resolution of these motions is made more difficult by the fact that many of defendants' arguments rely on documents beyond the pleadings, and therefore the court must determine the extent to which it will consider those documents at this procedural juncture. To the extent that the court

15

cannot or declines to consider those documents, the court must determine whether to exclude the materials or consider them and convert the motions into ones for summary judgment.

## APPLICABLE LEGAL STANDARDS

The court will dismiss a cause of action for failure to state a claim only when "'it appears beyond a doubt that the plaintiff can prove no set of facts in support of [its] claims which would entitle [it] to relief,'" *Beedle v. Wilson*, 422 F.3d 1059, 1063 (10th Cir. 2005) (quoting *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957)), or when an issue of law is dispositive, *Neitzke v. Williams*, 490 U.S. 319, 326 (1989). The court accepts as true all well-pleaded facts, as distinguished from conclusory allegations, and all reasonable inferences from those facts are viewed in favor of the plaintiff. *Beedle*, 422 F.3d at 1063. The issue in resolving such a motion is "not whether [the] plaintiff will ultimately prevail, but whether the claimant is entitled to offer evidence to support the claims." *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511 (2002) (quotation omitted); *accord Beedle*, 422 F.3d at 1063.

It is generally unacceptable for the court to look beyond the four corners of the complaint when deciding a Rule 12(b)(6) motion to dismiss. *MacArthur v. San Juan County*, 309 F.3d 1216, 1221 (10th Cir. 2002). However, it is "accepted practice, if a plaintiff does not incorporate by reference or attach a document to its complaint, but the document is referred to in the complaint and is central to the plaintiff's claim, a defendant may submit an indisputably authentic copy to the court to be considered on a motion to dismiss." *Id.* (quotation omitted). The rationale for this is that "[i]f the rule were otherwise, a plaintiff with

16

a deficient claim could survive a motion to dismiss simply by not attaching a dispositive document upon which the plaintiff relied." *GFF Corp. v. Associated Wholesale Grocers, Inc.*, 130 F.3d 1381, 1385 (10th Cir. 1997).

With respect to documents that are not referred to in plaintiff's complaint and/or are not central to plaintiff's claims, it is well established that the court must convert a motion to dismiss into a motion for summary judgment if the court relies upon material from outside the complaint. *Burnham v. Humphrey Hospitality REIT Trust, Inc.*, 403 F.3d 709, 713 (10th Cir. 2005). Upon converting the motion to one for summary judgment, the court "must provide the parties with notice so that all factual allegations may be met with countervailing evidence." *Id.* The required notice may be actual or constructive. *David v. City of Denver*, 101 F.3d 1344, 1352 (10th Cir. 1996). Thus, the submission of evidentiary materials by the movant, the nonmovant, or both of them constitutes sufficient notice. *Id.* The court has discretion in deciding whether to convert a motion to dismiss into a motion for summary judgment by accepting or rejecting the attached documents. *Poole v. County of Otero*, 271 F.3d 955, 957 n.2 (10th Cir. 2001).

## ANALYSIS

For the reasons explained below, the court will grant the motions to dismiss in part and deny them in part. Specifically, the court will deny the motion to dismiss Mid-America Pipeline Company (MAPCO) based on its conversion to Mid-America Pipeline Company, LLC (MAPL) because, even considering the documents filed with the Delaware Secretary of State,

the court cannot say that it appears beyond a doubt that Farmland can prove no set of facts which would entitle it to relief against MAPCO.  As to Mid-America's other motion to dismiss (i.e., the motion to dismiss claims against MAPL), although the court rejects Mid-America's collateral estoppel and tariff limitations period arguments at this procedural juncture, the court will grant the motion to dismiss Farmland's third-party beneficiary and tort claims; the court will otherwise deny the motion.  The court will grant Williams' motion to dismiss in its entirety because Farmland's complaint does not contain any relevant allegations against Williams.  As for the ONEOK defendants' motion to dismiss, the court will deny this motion in its entirety because Farmland's complaint and the court records from the Farmland bankruptcy proceedings submitted by the parties do not establish the facts necessary for the court to apply equitable or judicial estoppel to bar Farmland's claims and also because Farmland's reorganization plan and disclosure statement gave ONGL adequate notice of Farmland's potential claims against it and, consequently, Farmland preserved those claims.

## I.      **Motion to Dismiss Mid-America Pipeline Company**

Defendant Mid-America Pipeline Company, LLC (MAPL) in its capacity as predecessor of Mid-America Pipeline Company (MAPCO) seeks dismissal of Farmland's claims against MAPCO on the grounds that during the summer of 2002 MAPCO, a Delaware corporation, converted itself to a limited liability company under Delaware law and emerged from the conversion as MAPL.  Thus, MAPL contends that Farmland's claims against MAPCO should be dismissed because MAPCO no longer exists.  MAPL contends that, furthermore, because of the conversion Farmland's claims against MAPCO are redundant of its claims against

18

MAPL.  In support of this motion, MAPL relies on a "Certificate of Formation" for MAPL and a "Certificate of Conversion," both of which are authenticated by certificates from the Delaware Secretary of State stating that they were filed on July 30, 2002.  MAPL also relies on the Delaware Secretary of State's subsequent certification that the appropriate conversion documents were filed.  Based on these documents, MAPCO contends that it no longer exists as a distinct corporate entity and continues instead as MAPL.  Because MAPL's arguments rely on materials beyond the pleadings, the court must first determine the extent to which it may consider these documents on a Rule 12(b)(6) motion[4] without converting it to one for summary judgment.

The court first wishes to clarify that it will not consider these documents on the grounds that they are referred to in Farmland's complaint, they are central to Farmland's complaint, and they are indisputably authentic.  To the contrary, although the authenticity of these documents is not disputed, the documents are neither referred to in the complaint nor central to Farmland's claims.  Rather, MAPL has submitted these documents to set up the affirmative defense that MAPCO no longer possesses the capacity to be sued.  As such, these

_____

[4] MAPL has also thrown in a brief reference to dismissal under Fed. R. Civ. P. 12(b)(2), (4), and (5).  The court is unpersuaded by MAPL's cursory and undeveloped arguments on this point, particularly in light of Farmland's arguments in opposition to this aspect of MAPL's motion and the fact that MAPL did not respond to Farmland's arguments in its reply brief.  Thus, the court will deny this aspect of the motion because MAPL has not presented any meaningful authority in support of these arguments.  If MAPL feels aggrieved by the court's failure to consider the Rule 12(b)(2), (4), and (5) aspects of its motion to dismiss MAPCO, the court would welcome a motion to reconsider these issues with more developed argument on these points.

documents are central to this affirmative defense, not to plaintiff's claims.   Accordingly, the court will not consider these documents on this basis.

Instead, MAPL urges the court to take judicial notice of these materials as matters of public record without converting the motion into one for summary judgment.   Facts subject to judicial notice may be considered without converting a motion to dismiss into a motion for summary judgment.   *Grynberg v. Koch Gateway Pipeline Co.*, 390 F.3d 1276, 1278 n.1 (10th Cir. 2004).   At any stage of the proceedings the court may take judicial notice of a fact which is not subject to reasonable dispute, a requirement that is satisfied if the fact is "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned."   Fed. R. Evid. 201(b)(2).   Thus, "the court is permitted to take judicial notice of . . . facts which are a matter of public record."   *Van Woudenberg v. Gibson*, 211 F.3d 560, 568 (10th Cir. 2000), *abrogated on other grounds by McGregor v. Gibson*, 248 F.3d 946, 955 (10th Cir. 2001).   The decision of whether to take judicial notice of a particular fact is within the court's discretion.   *Klein v. Zavaras*, 80 F.3d 432, 435 n.5 (10th Cir. 1996).

In this case, the court will exercise its discretion and, without converting the motion to one for summary judgment, will take judicial notice of the fact that the Certificate of Formation for MAPL and the Certificate of Conversion from MAPCO to MAPL were both filed with the Delaware Secretary of State on July 30, 2002, and that the Delaware Secretary of State issued a certificate stating that the appropriate conversion documents were filed. These documents are public records which are properly authenticated.   *See* Fed. R. Evid. 902(4) (certified copies of public records are self authenticated).   Thus, the fact that they were

filed with and issued by the Delaware Secretary of State, as well as their contents, are not subject to reasonable dispute. Indeed, public documents filed with the secretary of state such as those at issue here generally satisfy the judicial notice standard and district courts routinely take judicial notice of such documents in resolving motions to dismiss. *See, e.g.*, *Shurkin v. Golden State Vintners, Inc.*, Case No. 04-3434, 2005 WL 1926620, at *6 (N.D. Cal. Aug. 10, 2005) (taking judicial notice of the fact of a certificate of organization); *CS Assets, LLC v. H & H Real Estate Dev., Inc.*, 353 F. Supp. 2d 1187, 1187 (N.D. Ala. 2005) (same, registration as a foreign corporation).

The issue, then, is what effect the filing of these documents had on the corporate status of MAPCO. The Delaware statutes in effect at the time of the conversion provided that any entity could convert to a Delaware limited liability company by filing a certificate of formation and a certificate of conversion with the secretary of state. Del. Code Ann. tit. 6, § 18-214(b) (2002). Upon the filing of these documents "the other entity shall be converted into a domestic limited liability company . . . subject to all of the provisions of this chapter." *Id.* § 18-214(d). The conversion does not effect the obligations or liabilities incurred prior to conversion. *Id.* § 18-214(e). All rights, privileges, powers, and property remain vested in the emerging limited liability company, and "all debts, liabilities and duties of the other entity that has converted shall remain attached to the domestic limited liability company to which such other entity has converted, and may be enforced against it to the same extent as if said debts, liabilities and duties had originally been incurred or contracted by it in its capacity as a domestic limited liability company." *Id.* § 18-214(f). Moreover, the conversion does not

affect any obligations or liabilities of the corporation incurred prior to the conversion. Del. Code Ann. tit. 8, § 266(d) (2002). Under these statutes, there seems to be little point in keeping MAPCO in this lawsuit because MAPL likely will be subject to full liability for MAPCO in any event.

Nonetheless, accepting the allegations in Farmland's complaint as true, as the court must in deciding a Rule 12(b)(6) motion, the court cannot say that it appears beyond a doubt that Farmland can prove no set of facts which would entitle it to relief against MAPCO. The Delaware statutes provide that the conversion constitutes a continuation of the other entity and is not a dissolution of the other entity "[u]nless otherwise agreed," Del. Code Ann. tit. 6, § 18-214(g), or "[u]nless otherwise provided in a resolution of conversion," Del. Code Ann. tit. 8, § 266(f). Thus, determining whether MAPCO in fact was dissolved or continued to MAPL may require resort to internal corporate documents. Indeed, Farmland contends that it needs to conduct discovery to obtain information concerning the distribution of MAPCO's assets. Also, the record before the court does not establish that MAPCO necessarily took the appropriate steps internally to convert the corporation to a limited liability company. *See, e.g.*, Del. Code Ann. tit. 6, § 18-214(h); Del. Code Ann. tit. 8, § 266(b). The certificate issued by the Delaware Secretary of State constitutes only "prima facie evidence of the conversion," Del. Code Ann. tit. 8, § 266(c), not conclusive proof. As such, this matter is not appropriate for resolution on a motion to dismiss. While the court recognizes that this issue ultimately may prove to be a mere technicality, it nonetheless presents an issue of fact that this court will not

resolve on a motion to dismiss.[5]    Accordingly, MAPL's motion to dismiss Farmland's complaint against MAPCO is denied.

The court also declines MAPL's invitation to convert the motion to one for summary judgment at this procedural juncture.   MAPL's motion relied on public records of which the court may take judicial notice on a motion to dismiss.   Thus, because MAPL did not rely on other types of materials outside the complaint, the court is not persuaded that MAPL's motion gave Farmland sufficient constructive notice that the court might convert the motion.

With this threshold issue of the nature of the relationship between MAPCO and MAPL defined, then, the court will again simplify its references to MAPCO and MAPL by referring to them, both collectively and singularly, as Mid-America.

## II.    Motion to Dismiss of Mid-America Pipeline Company, LLC (MAPL)

Mid-America's primary contention in support of its motion to dismiss is that all of Farmland's claims against it are barred by the doctrine of collateral estoppel based on the findings and conclusions made by the Kansas Corporation Commission (KCC) in complaint proceedings instituted by Farmland.   Mid-America also contends that Farmland's breach of contract, third-party beneficiary, and antitrust claims against Mid-America are barred by a limitations period contained in a tariff which it filed with the KCC.   Mid-America raises

---

[5] The court notes that it is entirely unpersuaded by two arguments raised by Farmland. The court cannot envision the relevance of the fact that counsel may have appeared on behalf of MAPCO in other proceedings in recent years.   Additionally, Farmland's reliance on the current version of Del. Code Ann. tit. 8, § 266(h) is puzzling given the absence of any cited authority to suggest that this statute applies retroactively.

separate grounds for dismissal of Farmland's third-party beneficiary, negligence per se, civil conspiracy, and bad faith and unfair dealing claims. Lastly, Mid-America moves for a more definite statement with respect to Farmland's antitrust claim.

### 1.      Collateral Estoppel

Mid-America's collateral estoppel argument is based on factual findings made by the KCC during proceedings which Farmland initiated by filing a complaint on August 29, 2001, regarding Mid-America's then-anticipated abandonment of the Texaco pipeline. The KCC conducted an evidentiary hearing on August 24-26, 2004. It issued a written order (the KCC Order) on January 31, 2005, and an order denying the parties' petitions for reconsideration on March 18, 2005 (the KCC Order on Reconsideration). Mid-America contends that all six of Farmland's claims are barred by collateral estoppel because the KCC has already determined that the loss of capacity Farmland allegedly experienced as a result of termination of the Texaco lease did not cause the unmet service demand that Farmland complains of in this case. This argument is based on a paragraph in the KCC Order which states as follows:

> The Commission concludes the evidence supports a finding that MAPL continued to provide reasonably efficient service, as required by K.S.A. 66-1,217 in fulfilling its common carrier obligations after its lease of the Texaco line was terminated. . . . Even though Farmland complained that MAPL's eastbound transport of product was inadequate and did not meet Farmland's demand, **the evidence established that Farmland's ability to receive eastbound deliveries at Coffeyville was reduced by limitations of Farmland's facilities** and this **contributed to** Farmland receiving less than what it demanded. **The record developed in this proceeding does not establish that MAPL failed to meet Farmland's eastbound [inbound] transport demand due to its loss of the Texaco line.**

KCC Order, ¶ 73, at 36-37 (emphasis added).  Farmland filed a petition for reconsideration of the KCC order, noting the implication that Farmland was not harmed by the loss of capacity that Mid-America experienced as a result of termination of the Texaco lease.   On reconsideration, the KCC reiterated that it "found MAPL violated the law but then concluded service thereafter provided by MAPL was sufficient and efficient public utility service as required by K.S.A. 66-1,217."  KCC Order on Reconsideration, ¶ 16, at 7.  The thrust of Mid-America's argument is that, because the KCC determined that Mid-America's loss of the Texaco pipeline capacity did not cause Farmland's unmet service demand, Farmland cannot prove damages as a proximate cause of the unmet service demand, which is an essential element of each claim asserted by Farmland.

Just as with the documents that Mid-America submitted regarding the conversion of MAPCO to MAPL, Farmland's complaint does not rely on the KCC Order or the KCC Order on Reconsideration and those orders are not central to Farmland's claims; thus, the court will not consider them in resolving Mid-America's Rule 12(b)(6) motion on that basis.   Instead, just as the court did with respect to Mid-America's motion to dismiss Farmland's claims against MAPCO, the court will take judicial notice of the KCC Order and the KCC Order on Reconsideration, as public records, without converting the motion to one for summary judgment for the purpose of evaluating the preclusive effect of those orders.[6]

---

[6] The court notes that, although Mid-America has not presented a certified copy of the KCC order, Farmland does not dispute its authenticity.  To be sure, Farmland points out that Mid-America has not submitted an indisputably authentic copy of the order, but Farmland does actually dispute its authenticity.

The parties do not dispute that the KCC was acting in a judicial capacity and therefore the KCC Order and the KCC Order on Reconsideration are entitled to the same preclusive effect to which they would be entitled in Kansas courts. *See Univ. of Tenn. v. Elliott*, 478 U.S. 788, 799 (1986); *Amoco Prod. Co. v. Heimann*, 904 F.2d 1405, 1414 (10th Cir. 1990). Under Kansas law, "the doctrine of collateral estoppel prevents a second litigation of the same issues between the same parties or their privies even in connection with a different claim or cause of action." *In re City of Wichita*, 277 Kan. 487, 506, 86 P.3d 513, 526 (2004) (quotation omitted).   For the doctrine to apply, three factors must be present: "(1) a prior judgment on the merits which determined the rights and liabilities of the parties on the issue based upon ultimate facts as disclosed by the pleadings and judgment, (2) the parties must be the same or in privity, and (3) the issue litigated must have been determined and necessary to support the judgment." *Id.* (quotation omitted).[7]

Farmland contends that the KCC Order and the KCC Order on Reconsideration did not constitute a prior judgment on the merits because the KCC is only authorized to determine whether there has been a violation of Kansas public utility laws, and it does not have authority to award damages. *See W. Kan. Express, Inc. v. Dugan Truck Line, Inc.*, 11 Kan. App. 2d 336, 339-41, 720 P.2d 1132, 1135-36 (1986).  The court is not persuaded by this argument.  K.S.A. § 66-176 provides a private right of action for damages whenever a public utility or common carrier violates the laws regulating public utilities and common carriers.  Thus, a finding by the

---

[7] Farmland concedes that the second of these elements is satisfied.

KCC that a public utility or common carrier has committed such a violation forms the basis for a civil action and thus implicitly determines the parties' rights and liabilities.[8]

The court will not, however, apply collateral estoppel to bar Farmland's claims, at least at this procedural juncture, largely because Mid-America's argument is based on a mistaken interpretation of the KCC Order. Mid-America construes the language from the KCC Order to mean that the KCC necessarily determined that Farmland suffered <u>no</u> damages. More precisely, the KCC Order states that Farmland's ability to receive inbound deliveries was "reduced" by limitations at the Coffeyville refinery and this "contributed to" Farmland receiving less than what it demanded. The KCC did not find, despite Mid-America's argument to the contrary, that Farmland suffered absolutely no damages whatsoever by Mid-America's reduction in pipeline capacity. Thus, the KCC's finding does not preclude Farmland from litigating the issue of the extent to which Mid-America did not meet its service demands, nor does it preclude Mid-America from litigating the extent to which limitations at the Coffeyville refinery contributed to Farmland's unmet service demand. Simply put, the issue of the extent to which each party was responsible for Farmland's damages attributable to its allegedly unmet service demand was not previously determined.

_____

[8] Nonetheless, this consideration, combined with the fact that the relevant portion of the KCC Order which refers to the capacity limitations of the Coffeyville refinery appears to be a relatively cavalier statement (when compared to the degree of thoroughness that the KCC devoted to some of the other issues), gives the court concerns about the extent to which this aspect of the KCC's finding was necessary to support its judgment and the extent to which Farmland had a full and fair opportunity to litigate this particular factual issue. The court simply notes that the complete record of the proceedings before the KCC on this issue is not before the court at this procedural juncture.

Moreover, the issues presented in Farmland's complaint in this case are not entirely identical to those which were decided by the KCC.   The KCC determined the lawfulness of the defendants' actions under its authority and jurisdiction to regulate public utilities and common carriers.   It determined whether Mid-America fulfilled its obligations as a common carrier when its capacity to transport liquids was significantly reduced after the Texaco lease ended and that pipeline was removed from public use.   To that end, it determined that Mid-America had an obligation to notify the KCC that its liquids pipeline capacity would be reduced when the Texaco lease expired, that Mid-America did not give the KCC the required notice, and that Mid-America nonetheless continued to provide "reasonably sufficient and efficient service" over its remaining pipelines as required by K.S.A. § 66-1,217.   That portion of the KCC Order upon which Mid-America's collateral estoppel argument relies is contained in the discussion of whether Mid-America met its statutory obligation to continue to provide reasonably sufficient and efficient service under § 66-1,217.   Farmland points out that the issue of whether Mid-America continued to provide "sufficient and efficient service" is a measure of public common carrier regulatory compliance unrelated to contractual obligations.   Farmland contends that "service demand" is a term of art in utility law whereby here Farmland is suing for unmet contract demand.   Thus, a finding by the KCC that Mid-America met a regulatory requirement designed to prevent discriminatory allocation of its available, but diminished, capacity is not the same issue as fulfillment of contractual obligations and duties owed.   The fact that the KCC's finding was relevant to Mid-America's legal duties as a common carrier rather than to its contractual duties to Farmland is further emphasized by the KCC Order on

Reconsideration in which the KCC reiterated that it concluded that Mid-America provided "sufficient and efficient public utility service as required by K.S.A. 66-1,217." Accordingly, if the KCC's finding is entitled to any preclusive effect, it is only as to those aspects of Farmland's claims which are based on Mid-America's legal obligations as a common carrier or public utility, not as to the contractual aspects of those claims.

Because of this distinction, the court finds Mid-America's reliance on *Leck v. Cont'l Oil Co.*, 971 F.2d 604 (10th Cir. 1992), and *Ruyle v. Cont'l Oil Co.*, 44 F.3d 837 (1994), to be misplaced. *Leck* involved a dispute between mineral interest owners and the operator of a drilling unit. The owners asserted before the Oklahoma Corporation Commission that the operator was permitting uncompensated drainage to occur by allowing production from another well in the same producing formation. The Commission determined that the owners' correlative rights were not being violated. The owners subsequently filed suit alleging breaches of contract and of fiduciary duty for failure to protect against drainage. The Tenth Circuit held that the Commission's ruling collaterally estopped the owners from asserting uncompensated drainage had occurred, pointing out that the Commission's finding that their correlative rights were not violated necessarily included a finding that no drainage was occurring. 971 F.2d at 606. *Ruyle* presented similar circumstances and, again, the Tenth Circuit applied collateral estoppel to bar the mineral interest owners' claims. In so holding, the Tenth Circuit explained that "when, as here, the judicial relief sought depends entirely upon the adjustment and protection of correlative rights already ruled on by the Commission, the court is not at liberty to make such a[n] award if the Commission has concluded that no

correlative rights have been violated." 44 F.3d at 845. Unlike in *Leck* and *Ruyle*, in this case Farmland's claims do not depend entirely upon the rights that have already been ruled on by the KCC. To the contrary, here Farmland's claims are based in part on Mid-America's contractual obligations to Farmland, which consist of obligations separate and distinct from Mid-America's common carrier/public utility obligations which were addressed by the KCC.[9]

For all of these reasons, then, Mid-America's motion to dismiss Farmland's complaint on the basis of collateral estoppel is denied. The court also declines to convert this aspect of Mid-America's motion into one for summary judgment. The motion relied on administrative rulings which are properly the subject of judicial notice that the court may consider in resolving a motion to dismiss. Because Mid-America did not rely on other types of materials outside the complaint, the court is not persuaded that Mid-America's motion gave Farmland sufficient notice that the court might convert the motion.

**2.      Tariff Limitations Period**

---

[9] For these reasons, the court recognizes the possibility that the KCC Order may have preclusive effect insofar as Farmland's claims are based on Mid-America's alleged common carrier/public utility obligations. But, importantly, Mid-America does not argue this point. Instead, it focuses on the KCC finding regarding unmet service demand as an attempt to negate the damage element of each of Mid-America's claims. Thus, the court's rejection of the collateral estoppel argument that Mid-America has raised at this procedural juncture is of course without prejudice to Mid-America asserting different preclusion arguments at a later date. *See, e.g.*, *Garcia v. Int'l Elevator Co.*, 358 F.3d 777, 782 (10th Cir. 2004) (extent to which res judicata or collateral estoppel barred action would be more appropriately decided in the context of a motion for summary judgment); *see, e.g.*, *Leck*, 971 F.2d at 606 (giving collateral estoppel effect to an order from the Oklahoma Corporation Commission on summary judgment).

Mid-America also contends that Farmland's breach of contract, third-party beneficiary, and antitrust claims should be dismissed because Farmland failed to give notice of its claims or to file suit within the time period required under the tariff which governs the relationship between Mid-America and Farmland.  The relevant tariff provision provides as follows:

> Notice of claims for loss or damage must be made in writing to Carrier within nine (9) months after delivery of the Product, or in the case of a failure to make delivery, then within (9) months after a reasonable time for delivery has elapsed.  Suit against Carrier shall be instituted only within two (2) years and one (1) day from the day when notice in writing is given by Carrier to the claimant that Carrier has disallowed the claim or any part or parts thereof specified in the notice.  Where claims are not filed or suits are not instituted thereon in accordance with the foregoing provisions, such claims will not be paid and the Carrier shall not be liable.

Mid-America Tariff, Item 75 Claims - Time for Filing, at 4.   The complaint alleges that because of the unavailability of the Texaco pipeline capacity, Mid-America did not meet contractual obligations, *see* Complaint (Doc. 1) ¶ 99, at 18-19, and resulted in Farmland's unmet service demands, *see id.* ¶ 101, at 19.  Mid-America argues that Farmland's claims are "for loss or damage" as the result of Mid-America's alleged "failure to make delivery."  Mid-America contends that Farmland did not give the required "notice" of the claim of failure to make delivery of the product within nine months after Mid-America failed to make delivery and that Farmland's claim is therefore barred by its failure to follow the required notice-and-disallowance procedure.  Mid-America contends, alternatively, that Farmland gave the required "notice" of the claim by virtue of the complaint that Farmland filed with the KCC on August 29, 2001; that Mid-America gave written notice that it was "disallow[ing]" the claim by virtue of its response to Farmland's complaint that Mid-America filed with the KCC on September

31

24, 2001; and that this case was filed on May 31, 2005, which was well after the two-year-and-one-day limitations period set forth in the tariff.

As a threshold matter, the court notes that it will resolve this dispute under a Rule 12(b)(6) standard without converting the motion to one for summary judgment.  In doing so, it will consider the contents of the 1996 settlement agreement on the grounds that the parties have submitted an indisputably authentic copy of this document and it is both relied on in Farmland's complaint and central to Farmland's breach of contract claim.  Additionally, the court will take judicial notice of the relevant tariff provision.  Mid-America has provided a certified copy of this tariff and the original is a public record which is on file with the KCC.  Thus, this is a proper subject for judicial notice.

"Tariffs are those terms and conditions which govern the relationship between a utility and its customers."  *Danisco Ingredients USA, Inc. v. Kan. City Power & Light Co.*, 267 Kan. 760, 765, 986 P.2d 377, 381 (1999).  When duly filed with the KCC they generally bind both the utility and the customer.  *Id.*  A provision in a tariff which purports to limit the liability of a public utility to its customers is enforceable to the extent that it is lawful[10] and declared invalid only insofar as it seeks to limit liability for greater than ordinary negligence.  *Id.* at 773, 986 P.2d at 386.  Here, Farmland does not argue that the tariff provision limiting Mid-

---

[10] At oral argument, Farmland clarified that it is contending that the tariff was not lawful because it was a tariff of MAPL rather than MAPCO.  This argument has not been fully developed, but suffice it to say that based on the record currently before the court Mid-America has not conclusively overcome this defense.  Because Mid-America bears the burden of establishing this affirmative defense, this is yet another reason for the court to reject Mid-America's argument tariff limitations period argument at this procedural juncture.

America's liability by setting forth a time for the filing of claims against it is invalid because it seeks to limit liability for greater than ordinary negligence.   Indeed, the Kansas Supreme Court has held that more stringent time limitations are enforceable as reasonable.   *Id.* at 770-71, 986 P.2d at 384-85 (noting that in *Russell v. Tel. Co.*, 57 Kan. 230, 233-34, 45 P. 598 (1896), the Kansas Supreme Court "upheld a 60-day limitation on the time in which claims for negligence could be brought").   Thus, the sole question presented here is the extent to which the "Time for Filing" provision relied upon by Mid-America is enforceable against Farmland's claims in this case.

Farmland contends that its claims do not fall within the ambit of the tariff limitations period because its claims are not claims for "failure to make delivery" or for "loss or damage" to "Product" after delivery.   Farmland's theory is that the tariff limitations period applies to circumstances when the product is accepted (i.e., tendered) for re-delivery by a common carrier but then is not re-delivered out of the pipeline or it applies in those circumstances in which product has been tendered to the pipeline but re-delivery terms have been breached, such as the re-delivery of contaminated product or re-delivery of less product than tendered by a shipper.   "A public utility tariff is to be construed in the same manner as a statute."   *Id.* at 772, 986 P.2d at 385; *accord Grindsted Prods., Inc. v. Kan. Corp. Comm'n*, 262 Kan. 294, 310, 937 P.2d 1, 11 (1997).   Thus, a tariff must "be construed as a whole, including footnotes, from the ordinary and popular meaning of the words used."   *Grindsted*, 262 Kan. at 310, 937 P.2d at 11.   Based on this fundamental principle of tariff interpretation, the court rejects the meaning that Farmland seeks to attribute to the tariff provision because it is contrary to the

ordinary and popular meaning of the words used in the tariff. The tariff, by its plain terms, applies to a "failure to make delivery," not, as Farmland would have it, a "failure to make redelivery." Thus, the court finds Farmland's interpretational argument to be without merit.

Nonetheless, the court does believe that Farmland's other argument precludes the court from ruling that Farmland's complaint fails to state a claim upon which relief can be granted. In this respect, Farmland contends that Mid-America has not produced anything to show that Mid-America gave Farmland the required notice that it was disallowing Farmland's claim sufficient to trigger the running of the two-year-and-one-day limitations period. By raising the bar of the tariff limitations period, Mid-America has asserted an affirmative defense for which it has the burden of proof. Certainly, courts may dismiss a claim based upon the applicable statute of limitations on a Rule 12(b)(6) motion when the face of the complaint reveals that the claim is time barred. *See Aldrich v. McCulloch Props., Inc.*, 627 F.2d 1036, 1041 n.4 (10th Cir. 1980) (statute of limitations defense may be resolved on a Rule 12(b)(6) motion "when the dates given in the complaint make clear that the right sued upon has been extinguished"). But, here, the allegations in Farmland's complaint do not reveal that Farmland's claims are barred by the tariff limitations period. It is not incumbent upon Farmland to allege facts to prove that the required notices were given or not given so as to avoid its claims being barred by the tariff limitations period. Rather, at this procedural juncture Mid-America has the burden of proving that it appears beyond a doubt that Farmland can prove no set of facts demonstrating that it is entitled to relief. Absent a factual record, this

34

issue simply is not ripe for determination on a Rule 12(b)(6) motion.   Thus, this aspect of Mid-America's motion is denied.

The court also declines to convert this motion to one for summary judgment.   Mid-America is of course welcome to renew this argument on a motion for summary judgment if it wishes to do so.   Even then, the court simply wishes to acknowledge that it can envision that issues of fact may permeate the determination of whether the required notices were given and, to that end, on a motion for summary judgment Mid-America should be mindful that it will carry the heavy burden of persuading the court that it is entitled to judgment as a matter of law on this issue.

### 3.        Third-Party Beneficiary Claim

Mid-America contends that it is not a proper party to Farmland's third-party beneficiary claim because Farmland does not allege that Mid-America breached the contract that forms the basis for this claim. In *Bodine v. Osage County Rural Water Dist. No. 7*, 263 Kan. 418, 949 P.2d 1104 (1997), the Kansas Supreme Court held that the trial court properly granted summary judgment on a breach of contract/third-party beneficiary claim where the plaintiff improperly named the wrong party to the contract.   *Id.* at 432-33, 949 P.2d at 1114-15.   In *Bodine*, the plaintiff's breach of contract/third-party beneficiary claim was premised on a contract between the city and the rural water district.   The plaintiff had sued the rural water district but had alleged that the city, not the rural water district, breached the contract.   The court held that the plaintiff could not sue the rural water district because the plaintiff did not allege that the rural water district breached the contract.   *Id.* at 433-32, 949 P.2d at 1114.   The

court approvingly cited *Wunschel v. Transcon. Ins. Co.*, 17 Kan. App. 2d 457, 839 P.2d 64 (1992), in which the plaintiff third-party beneficiaries properly sued the party who breached the contract directly without naming the other party to the contract at all, and *Noel v. Pizza Hut, Inc.*, 15 Kan. App. 2d 225, 805 P.2d 1244 (1991), in which the court allowed the third-party beneficiary to sue either party to the contract as long as the third-party beneficiary actually sued the party to the contract who was responsible for or actually caused the breach of contract.   In this case, then, Farmland can maintain its third-party beneficiary claim only against party(ies) to the Texaco pipeline lease who Farmland alleges actually breached that lease agreement.

In support of Mid-America's motion to dismiss, Mid-America relies on the paragraphs in the complaint setting forth the third-party beneficiary claim in which Farmland alleges that "Texaco terminated the pipeline capacity lease with Mid-America" and that Farmland has been "damaged by the breach of contract by Texaco, ONEOK, OFSC, and ONGL."  Compl. (Doc. 1), ¶¶ 109, 116, at 20, 21.   In response to this argument, Farmland contends that the complaint alleges a third-party beneficiary relationship premised on the fact that Mid-America used the pipeline to fulfill its common carrier/public utility service obligations.   In support of this argument, Farmland points out that a provision in the Texaco pipeline lease states as follows:

> It is understood that [Mid-America] is a common carrier and shall operate the Pipeline as a common carrier pipeline.   It is agreed that nothing in this Agreement is intended to be or shall be interpreted in contradiction to the duties and obligations of [Mid-America] as a common carrier.

Lease Agreement ¶ 12, at 9.

36

After reviewing the parties' arguments and the allegations in the complaint relating to this issue, the court will grant Mid-America's motion to dismiss this claim because the claim is predicated on a breach of the Texaco pipeline lease and Farmland has failed to direct the court's attention to any allegations in the complaint that Mid-America (rather than Texaco or the ONEOK entities) breached that agreement. Instead, Farmland has simply reiterated the nature of the contract that forms the basis for this claim without directing the court's attention to any allegation that Mid-America was the party who breached the Texaco pipeline lease. Accordingly, this aspect of Mid-America's motion to dismiss is granted.

### 4.    Negligence Per Se

The elements of negligence per se under Kansas law are "(1) a violation of a statute, ordinance, or regulation, and (2) the violation must be the cause of the damages resulting therefrom." *Pullen v. West*, 278 Kan. 183, 194, 92 P.3d 584, 593 (2004). Additionally, the plaintiff must establish that the legislature intended to provide an individual right of action for injury arising out of the violation. *Id.* Here, plaintiff's negligence per se claim is based on the allegation that Mid-America and Texaco unlawfully abandoned the Texaco pipeline in violation of public utility law as determined by the KCC and that the legislature has provided Farmland with a private right of action for this violation pursuant to K.S.A. § 66-176. Mid-America argues that the court should dismiss Farmland's negligence per se claim because Farmland does not allege that Mid-America violated a statute, ordinance, or regulation; instead, this claim is based on the allegation that the KCC found that MAPL failed to fulfill a common law obligation to notify the KCC of the loss of capacity.

The court first wishes to clarify the relevance of the reference in Farmland's complaint to K.S.A. § 66-176.  This statute provides for treble damages and attorney fees against "[a]ny public utility or common carrier which shall violate any of the provisions of law for the regulation of such public utilities or common carriers."  The Kansas Court of Appeals has held that this statute provides a private right of action for a violation of common carrier regulations. *See Dietz v. Atchison, Topeka & Santa Fe Ry. Co.*, 16 Kan. App. 2d 342, 346-47, 823 P.2d 810, 814-15 (1991); *see also United Cities Gas Co. v. Brock Exploration Co.*, 995 F. Supp. 1284, 1291 (D. Kan. 1998).  Thus, Farmland's allegation referencing § 66-176 satisfies the aspect of its negligence per se claim in which the plaintiff must allege that the legislature intended to provide a private right of action for a violation of certain regulations.  This reference does not, however, satisfy the first element of a negligence per se claim, which is the alleged violation itself.

Here, Farmland's negligence per se claim must be dismissed because Farmland has failed to identify any statute, ordinance, or regulation which it alleges Mid-America has violated.  To this end, the court considers the contents of the KCC Order without converting the motion to one for summary judgment.  Neither party disputes the authenticity of this document, plaintiff's allegations implicitly reference the KCC's findings, *see* Compl. (Doc. 1) ¶ 126, at 23 (abandonment of the pipeline violated public utility law "as was determined by the KCC"), and those findings are central to plaintiff's negligence per se claim.  Thus, this order is proper for the court to consider on a motion to dismiss.  This order reveals that the KCC's finding was premised on a violation of common law obligations, not statutory or

regulatory violations. The KCC specifically found that no specific statute requires a common carrier such as Mid-America to seek approval from the KCC before abandoning a liquids pipeline. *See* KCC Order ¶¶ 36-38, at 17-18. It found, instead, that as a common carrier Mid-America had a common law obligation to notify the KCC of significant changes in its capacity to transport product on liquids pipelines, *id*. ¶ 46, at 22-23, and that Mid-America did not provide the KCC with the required notice, *id*. ¶ 62, at 31. *See also* KCC Order on Reconsideration ¶ 38, at 16 ("[T]he Commission appropriately reviewed and considered many cases in determining the appropriate outcome in this docket."). Consequently, neither the allegations in Farmland's complaint nor the KCC Order upon which Farmland's negligence per se claim is based identify any statute, ordinance, or regulation which KCC allegedly violated.

Instead, Farmland argues that a tariff is in the form of a "statute, ordinance, or regulation," and that Mid-America's failure to seek appropriate authority for its abandonment of service in violation of its tariff certainly could be found to have contributed to Farmland's damages. This argument is insufficient to withstand Mid-America's motion to dismiss for a number of reasons. First, neither Farmland's complaint nor the KCC Order suggests that Mid-America's violation of a tariff provision forms the basis of Farmland's negligence per se claim. Additionally, Farmland has not cited any authority or presented any meaningful argument to support the proposition that a tariff violation can satisfy the "statute, ordinance, or regulation" element of a negligence per se claim. And, perhaps most importantly, the record of the KCC proceedings does not reveal that Farmland has exhausted its administrative remedies on this issue. *See generally Grindsted Prods., Inc. v. Kan. City Power & Light Co.*, 21 Kan. App.

2d 435, 901 P.2d 20 (1995) (holding the KCC must first interpret a tariff before a plaintiff can bring an action in court seeking damages under § 66-176).   Accordingly, the court will grant Mid-America's motion to dismiss this claim.[11]

### 5.   Civil Conspiracy

Mid-America argues that the court should dismiss Farmland's civil conspiracy claim because there is no underlying tort to support this claim.   Certainly, the court is dismissing Farmland's tort claims including its negligence per se claim and, as will be discussed below, the tort aspect of its bad faith and unfair dealing claim.   The court is also dismissing Farmland's third-party beneficiary claim, albeit without prejudice.   Nonetheless, Farmland's antitrust claim remains, as does its breach of contract claim, including the aspect of that claim involving its alleged breach of the duty of good faith and fair dealing.   Farmland explains that it is basing its civil conspiracy claim on its contract claims.[12]   The issue presented with respect to this claim, then, is whether Farmland's civil conspiracy claim may be predicated on its breach of contract claim.   Mid-America contends that it cannot, citing *Meyer Land & Cattle Co. v. Lincoln County Conservation District*, 29 Kan. App. 2d 746, 31 P.3d 970 (2001), for the proposition that a civil conspiracy claim must be based "on a valid, actionable underlying tort."   *Id.* at 753, 31 P.3d at 976 (citing *Stoldt v. City of Toronto*, 234 Kan. 957, 967, 678 P.2d 153 (1984)).

---

[11] The court is dismissing this claim without prejudice to Farmland filing an amended complaint.   Thus, Farmland may file an amended complaint asserting this tariff violation theory if it wishes to do so and if it believes that it can do so in compliance with Fed. R. Civ. P. 11.

[12] The court is not deciding here whether such a claim may be based on an antitrust violation because Farmland does not contend that it is asserting such a theory.

On the other hand, Farmland contends that it can, citing *Indy Lube Investments, L.L.C. v. Wal-Mart Stores, Inc.*, 199 F. Supp. 2d 1114 (D. Kan. 2002), and *Pizza Management, Inc. v. Pizza Hut, Inc.*, 737 F. Supp. 1154 (D. Kan. 1990), for the proposition that "'Kansas courts have recognized a conspiracy to procure or induce a breach of contract.'" *Indy Lube Invs.*, 199 F. Supp. 2d at 1126 (quoting *Pizza Mgmt.*, 737 F. Supp. at 1165).

In resolving this issue, absent controlling precedent this court must attempt to predict how the Kansas Supreme Court would decide this matter. *Royal Maccabees Life Ins. Co. v. Choren*, 393 F.3d 1175, 1180 (10th Cir. 2005) (federal court sitting in diversity must apply state law as announced by the highest state court). The court must "follow any intermediate state court decision unless other authority convinces [it] that the state supreme court would decide otherwise." *Save Palisade FruitLands v. Todd*, 279 F.3d 1204, 1207 n.1 (10th Cir. 2002). The court should consider analogous decisions by the state supreme court, decisions of lower courts in the state, decisions of federal and other state courts, and the general weight and trend of authority. *Progressive Cas. Ins. Co. v. Engemann*, 268 F.3d 985, 987-88 (10th Cir. 2001). Dicta from the state supreme court represents the court's own comment on the development of state law and "is an appropriate source from which this prediction may be made." *Carl v. City of Overland Park*, 65 F.3d 866, 872 (10th Cir. 1995).

Applying this standard, the court will follow the decision of the Kansas Court of Appeals in *Meyer Land & Cattle Co.* that a civil conspiracy claim must be based on a valid, actionable, underlying tort because no authority exists to persuade the court that the Kansas Supreme Court would decide otherwise. The Kansas Supreme Court has stated that civil

41

"conspiracy is not actionable without commission of some wrong giving rise to a cause of action independent of the conspiracy." *State ex rel. Mays v. Ridenhour*, 248 Kan. 919, 927, 811 P.2d 1220, 1226 (1991); *accord Stoldt v. City of Toronto*, 234 Kan. at 967, 678 P.2d at 161. Additionally, in discussing civil conspiracy in *Mays*, the Kansas Supreme Court looked to the Restatement (Second) of Torts § 876 (1977) for guidance. 248 Kan. at 936, 811 P.2d at 1231-32. The court noted that § 876(a) defines civil conspiracy and states that a person is subject to liability for "harm resulting to a third person from the tortious conduct of another" if he or she "does a tortious act in concert with the other or pursuant to a common design." *See also* Restatement § 876 cmt.c ("In order for the rule stated in Clause (a) to be applicable, it is essential that the conduct of the actor be in itself tortious.").

Farmland's reliance on the statements in *Indy Lube Investments* and *Pizza Management* is misplaced for a number of reasons. First and foremost, the court must look to the decisions of Kansas state courts, not Kansas federal courts, in attempting to predict how the Kansas Supreme Court would decide this issue. Moreover, in *Indy Lube Investments* the court declined to dismiss the civil conspiracy claim because it was based in part on a tortious interference claim. 199 F. Supp. 2d at 1126. Also, *Pizza Management* pre-dated the Kansas Court of Appeals' opinion in *Meyer Land & Cattle Co.*, and thus is of questionable value insofar as it is contrary to the Kansas Court of Appeals' statement that a civil conspiracy claim must be based on a valid, actionable underlying tort. Indeed, in *Pepsi-Cola Bottling Co. v. PepsiCo, Inc.*, 431 F.3d 1241 (10th Cir. 2005), the Tenth Circuit, citing *Stoldt*, affirmed the

district court's grant of summary judgment on a civil conspiracy claim where the facts did not create a triable issue on the underlying tort claims.  *Id.* at 1268.

In sum, then, this court predicts that the Kansas Supreme Court would require that a civil conspiracy claim be predicated on a valid, actionable underlying tort rather than a mere breach of contract claim.  Because Farmland has no such tort claim against Mid-America, the court will dismiss Farmland's civil conspiracy claim.

**6.     Bad Faith and Unfair Dealing**

Mid-America seeks dismissal of Farmland's bad faith and unfair dealing claim on the grounds that Kansas courts do not recognize such a cause of action.  This aspect of Mid-America's motion to dismiss is granted to the extent that Farmland's complaint can be construed as alleging a claim for the tort of bad faith because it is well settled that "Kansas does not recognize the tort of bad faith."  *Assocd. Wholesale Grocers, Inc. v. Americold Corp.*, 261 Kan. 806, 845, 934 P.2d 65, 89 (1997); *accord Spencer v. Aetna Life & Cas. Ins. Co.*, 227 Kan. 914, 926, 611 P.2d 149, 158 (1980).

But, the motion is denied to the extent that Farmland's complaint can be construed as asserting a claim for breach of contract based on a breach of the implied duty of good faith and fair dealing.  "Kansas courts imply a duty of good faith and fair dealing in every contract."  *Kan. Baptist Convention v. Mesa Operating Ltd. P'ship*, 253 Kan. 717, 725, 864 P.2d 204, 211 (1993) (quotation omitted); *accord Daniels v. Army Nat'l Bank*, 249 Kan. 654, 658, 822 P.2d 39, 43 (1991).  Thus, parties may not "intentionally and purposely do anything to prevent the other party from carrying out his part of the agreement, or do anything which will have the

effect of destroying or injuring the right of the other party to receive the fruits of the contract." *Daniels*, 249 Kan. at 658, 822 P.2d at 43 (quotation omitted).   Certainly, it does not appear beyond a doubt that Farmland cannot prove any set of facts which would entitle it to relief under a theory that Mid-America breached the parties' various agreements by failing to abide by its duty of good faith and fair dealing under those contracts.   Because Farmland has stated a breach of contract claim based on the implied duty of good faith and fair dealing, then, this aspect of Mid-America's motion to dismiss is denied.

### 7.    Antitrust Claim

Mid-America's final argument is that Farmland should be required to file a more definite statement because the claim is so vague that it is essentially impossible to formulate a meaningful response.   A party may move for a more definite statement of any pleading that is "so vague or ambiguous that a party cannot reasonably be required to frame a responsive pleading." Fed. R. Civ. P. 12(e).   The court has carefully reviewed the antitrust allegations in Farmland's complaint and concludes that they are not so vague or ambiguous that Mid-America cannot reasonably be required to frame a responsive pleading.   The claim alleges that Texaco and ONEOK agreed and conspired to remove the Texaco pipeline from public service and devote it solely to service Frontier Oil to the detriment of Farmland, and also to eliminate competition in the transport and sale of blend stocks and NGLs in the Mid-Continent Region; that Mid-America joined in this combination by failing to defend and preserve its continuing use of the Texaco pipeline; that they combined for the purpose of preventing competition; and that they restrained trade by causing price increases.

44

Mid-America correctly points out that the complaint does not even identify the federal or state antitrust statute which Mid-America allegedly violated.   Although the inclusion of statutory references often is desirable, a motion for a more definite statement generally cannot be used to require the plaintiff to set forth the statutes upon which the plaintiff intends to rely. 5C Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure § 1377, at 349-50 (3d ed. 2004).   Even so, Farmland further clarifies in its response brief that it is bringing its antitrust claim pursuant to Kansas antitrust law.   If Mid-America wishes to obtain additional factual details with respect to this claim, the procedural vehicle for doing so is to elicit information through the discovery process.   Its motion for a more definite statement is denied.

### III.   <u>Williams' Motion to Dismiss</u>[13]

The thrust of Williams' motion to dismiss is that Farmland has lumped together all of the separate corporate entities by defining MAPCO, MAPL, MAPCO Intrastate, and Williams as the "MAP Entities" without alleging that Williams itself did anything improper.   The court will address this argument, first, as an overarching theory and, second, in terms of its implications for each of the respective claims.   As explained below, the court agrees with Williams and therefore will grant the motion.

---

[13] Williams joins in the arguments Mid-America raised in support of its motion to dismiss.   The court rejects those arguments in part for the reasons stated above with respect to Mid-America's arguments and will not reiterate that reasoning here.   Otherwise, the court will explain where it is granting Williams' motion based on arguments advanced by Mid-America.

The court will not address Williams' statute of limitations arguments because the court finds that all of Farmland's claims against Williams are subject to dismissal in any event.

## A.     Categorical Arguments Concerning the MAP Entities

Williams contends that Farmland's complaint does not allege that Williams breached any obligation to Farmland or was in any way responsible for damages that Farmland allegedly suffered.   Williams points out that, according to the allegations in Farmland's complaint, Williams did not enter the picture until it entered into the letter agreement with Farmland on February 12, 1998, which required certain amendments to plaintiff's previous agreements with Mid-America, then subsequently acquired Mid-America on March 30, 1998.   In response to this argument, Farmland directs the court's attention to the allegations contained in paragraphs 18, 63-68, 103, 134, and 138 of the complaint.   Farmland contends that the particular relationship that may have existed between Williams and Mid-America during the relevant time period and the degree of control that Williams was exercising over Mid-America is unclear. It argues that the extent to which the various "MAP Entities" may have partial or total legal responsibility should be determined after reasonable discovery.

The court has thoroughly reviewed the allegations in the complaint and, in particular, the paragraphs in the complaint which Farmland relies on.   Those paragraphs allege that the MAP Entities owned and/or operated the Conway-El Dorado-Coffeyville pipeline system; that Mid-America became a wholly owned subsidiary of "the Williams Companies, Inc."[14] as of March 30, 1998; that Farmland and Williams entered into the 1998 letter agreement and, subsequently, the 1998 transportation and capacity leases which amended the 1996

---

[14] Note that this is not even the same Williams entity as named in the complaint, which is Williams Energy Services.

46

agreements; that Farmland was damaged by Mid-America's breach of contract, by the breach of the Texaco pipeline capacity lease, and by the removal of the Texaco pipeline from public service; and that Mid-America's failure to renew the lease or buy the Texaco pipeline rendered Mid-America unable to meet its contract and common carrier/public utility obligations. Williams correctly points out that Farmland's complaint does not include any allegation that Williams controlled Mid-America, that Williams was the alter ego of Mid-America, that Mid-America served as Williams' agent, or that the corporate veil should be pierced to impose liability on Williams for the acts of Mid-America. Thus, although Farmland makes arguments of control and agency in its response brief, no such allegations are found in Farmland's complaint.

Because the allegations in Farmland's complaint depend upon none of these theories in seeking to impose liability against Williams, then, the court will not allow any of Farmland's claims to proceed against Williams under these theories. Consequently, Farmland's claims against Williams must stand, if at all, on direct theories of liabilities and the court will examine each claim accordingly.[15]

### A.    Breach of Contract Claim

The essential elements of a breach of contract claim under Kansas law are as follows: (1) the existence of a contract between the parties; (2) sufficient consideration to support the

---

[15] Again, the court is dismissing Farmland's claims against Williams without prejudice to Farmland filing an amended complaint asserting these theories of liability against Williams if it wishes to do so and if it believes that it can do so without running afoul of Fed. R. Civ. P. 11.

contract; (3) the plaintiff's performance or willingness to perform in compliance with the contract; (4) the defendant's breach of the contract; and (5) damages to the plaintiff caused by the breach.  Pattern Instructions Kansas 3d, Civil § 124.01-A; *Commercial Credit Corp. v. Harris*, 212 Kan. 310, 313, 510 P.2d 1322, 1325 (1973).  Here, Williams points out that Farmland alleges that Mid-America, not Williams, breached the alleged contractual obligations and that Farmland was damaged by Mid-America's alleged breach.  *See* Compl. (Doc. 1) ¶¶ 102-103, at 19.  Specifically, paragraph 102 alleges that Mid-America "abandoned service to [Farmland] in contravention of the contract terms embodied in the 1996 Settlement Agreement, the 1996 Transportation Agreement, and the 1998 Transportation Agreement." Although Farmland's complaint alleges that Williams was a party to these various agreements, the court has not found and Farmland has not directed the court's attention to anything in the complaint which alleges that Williams breached any of these agreements.  Thus, even accepting the allegations in Farmland's complaint as true (as the court must on a motion to dismiss), the complaint does not state a claim against Williams for breach of contract because it does not allege that Williams breached any contract.  Accordingly, this aspect of Williams' motion to dismiss is granted.

### B.     Third-Party Beneficiary Claim

The court will also grant Williams' motion to dismiss Farmland's breach of contract/third-party beneficiary claim against Williams for essentially the same reasons as stated above with respect to this claim against Mid-America.  That is, Farmland has failed to direct the court's attention to any allegations in the complaint that Williams (rather than

48

Texaco or the ONEOK entities) breached the Texaco pipeline capacity lease.   Additionally, Farmland's breach of contract/third-party beneficiary claim against Williams is even further afield than the claim against Mid-America because Farmland's complaint does not even allege that Williams was a party to the Texaco pipeline capacity lease.

### C.   Antitrust

Williams argues that the court should dismiss Farmland's antitrust claim against Williams because the complaint makes no antitrust allegations against Williams.   The court agrees.   The general factual allegations in the complaint do not allege that Williams engaged in any activity which would constitute a violation of the antitrust laws.   Also, Farmland's antitrust claim, *see* Compl. (Doc. 1), ¶¶ 117-124, at 21-22, contains no allegations against Williams.   Instead, the complaint alleges that Texaco and the ONEOK entities entered into the antitrust conspiracy to remove the Texaco pipeline from public service and that Mid-America joined in the conspiracy by failing to defend and preserve its continuing use of the pipeline. Accordingly, because Farmland's complaint does not allege that Williams committed an antitrust violation, Williams' motion to dismiss is granted with respect to this claim.

### D.   Negligence Per Se

The court will grant Williams' motion to dismiss Farmland's negligence per se claim against Williams for essentially the same reasons as stated above with respect to this claim against Mid-America.   That is, Farmland has failed to allege that Williams violated a statute, ordinance, or regulation.   Additionally, this claim is dismissed because Farmland's negligence per se allegations, *see* Compl. (Doc. 1) ¶¶ 125-129, at 23, do not pertain to Williams at all.

### E.      Civil Conspiracy

Williams argues that the court should dismiss Farmland's civil conspiracy claim because, again, Farmland does not allege that Williams was a part of any conspiracy. The complaint does not allege that Williams was involved in any conspiracy, had an object to be accomplished, had a meeting of the minds with anyone, engaged in any unlawful overt acts, or that Farmland suffered any damages due to Williams' actions. The notion of such a conspiracy certainly cannot be gleaned from the general factual allegations in the complaint. And, the civil conspiracy claim itself, *see* Compl. (Doc. 1), ¶¶ 130-134, at 23, contains no allegations against Williams. Instead, it alleges that Mid-America, Texaco, and the ONEOK defendants combined to unlawfully remove the Texaco pipeline capacity from public service; they were fully aware that this would harm Farmland; these actions resulted in the breach of the lawful duties that Mid-America and Texaco owed to Farmland; and Farmland was damaged because of these actions. Thus, Farmland's complaint does not allege that Williams engaged in any civil conspiracy. Accordingly, Williams' motion to dismiss is granted with respect to this claim.

### F.      Bad Faith and Unfair Dealing

Insofar as Farmland asserts its bad faith and unfair dealing claim as a separate tort, the court will grant Williams' motion for the same reasons as stated above with respect to this claim against Mid-America. Insofar as Farmland asserts this claim as a breach of the duty of bad faith and fair dealing implicit in the contract, this claim is dismissed because Farmland does not make any relevant allegations against Williams. Specifically, this claim alleges that

50

Mid-America (not Williams) had a duty to honor the covenant of good faith and fair dealing inherent in the 1996 settlement and transportation agreements and the 1998 transportation agreement; that Mid-America held itself out as a common carrier/public utility in these agreements; and that Mid-America promised but failed to make pipeline capacity available to Farmland.  *See* Compl. (Doc. 1) ¶¶ 135-139, at 24.   Absent any allegations pertaining to Williams, then, the court will dismiss this claim.

**IV.     ONEOK Defendants' Motion**

The ONEOK defendants' motion to dismiss arises from Farmland's alleged failure to disclose its claims against the ONEOK defendants in its filings with the bankruptcy court.  The ONEOK defendants allege that, because of this failure, Farmland's claims against them are barred by the doctrine of equitable estoppel, judicial estoppel, and res judicata.  They urge the court to take judicial notice of the filings of the bankruptcy court, which the court will do without converting the motion to one for summary judgment.    Even so, the ONEOK defendants' burden of establishing that they are entitled to dismissal on any of these grounds is a high one at this procedural juncture.   They must conclusively establish those affirmative defenses such that the court can find that it appears beyond a doubt that the Farmland can prove no set of facts which would entitle it to relief on its claims against the ONEOK defendants.

**A.     Background**

On May 31, 2002, Farmland Industries, Inc. and some of its affiliates (collectively, Farmland) filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code.  In the schedules filed with the bankruptcy court, Farmland did not disclose that it held claims against

any of the ONEOK entities. But it disclosed that the following ONEOK entities held claims against Farmland: (1) an unliquidated and disputed claim held by Kansas Gas Service a/k/a a Division of ONEOK, Inc.; (2) two trade payables in the amount of $28,471.45 and $14,263.80 held by ONEOK Energy Marketing & Trading Co., L.P.; (3) a trade payable in the amount of $2,859,601.50 held by ONEOK Gas Marketing Co.; and (4) a trade payable in the amount of $24,103.88 held by ONEOK NGL Marketing (ONGL). Farmland also acknowledged the existence of an agreement between Farmland and ONGL.

The only ONEOK defendant that was a creditor in the Farmland bankruptcy was ONGL, which filed a proof of claim in the amount of $24,103.88 against Farmland. The other two ONEOK entities with scheduled claims—ONEOK Energy Marketing & Trading Co., L.P. and ONEOK Gas Marketing Co.—are not named as defendants in this lawsuit.[16]

On October 31, 2003, Farmland filed both its disclosure statement in support of its Second Amended Joint Plan of Reorganization and its Second Amended Joint Plan of Reorganization. The disclosure statement referenced Farmland's then-pending complaint with the KCC in its description of pending litigation. Specifically, it disclosed that Farmland had filed a complaint with the KCC against Mid-America, Williams, "**and others** regarding violations of the regulations governing utilities and common carriers." (Emphasis added.) Both the disclosure statement and the reorganization plan stated that the liquidating trustee

---

[16] Counsel for these two ONEOK affiliates sent a letter to Farmland stating that they had no claims against the estate. The scheduled claims of these two ONEOK affiliates were later disallowed by order of the bankruptcy court.

(i.e., ultimately, the plaintiff herein) would "have the exclusive right to enforce any and all **present or future** Litigation Claims."   (Emphasis added.)   The reorganization plan defined "Litigation Claims" as "claims, rights, causes of action, defenses, counterclaims, suits or proceedings, whether in law or in equity, **whether known or unknown**, that the Debtors, the Estates, or the Bankruptcy Committees may hold or assert against any non-Debtor Entity." (Emphasis added.)   The reorganization plan provided that all of Farmland's rights and causes of action would vest in the liquidating trustee.   It charged the liquidating trustee with the duty to enforce and prosecute, to the extent that it believed advisable with the approval of the post-confirmation committee, to settle, abandon or assign the litigation claims for the benefit of the estate.   The liquidating trustee became the holder of, with the exclusive right to enforce, any and all present or future litigation claims and any rights of any of the debtors which arose before or after the bankruptcy cases were commenced.   The bankruptcy court approved the reorganization plan on December 19, 2003.

In response to the ONEOK defendants' estoppel and res judicata arguments, Farmland has submitted facts generally indicating that during the year 2003 Farmland became increasingly aware of the ONEOK entities' involvement with the Texaco pipeline.   More specifically, it appears that the written testimony filed with the KCC on December 19, 2003 (the same day that the bankruptcy court approved the reorganization plan) by KCC staff member Leo Haynos was particularly illuminating.   The court will not consider this evidence in resolving the ONEOK defendants' motion to dismiss because to do so would be improper and the court finds that the ONEOK defendants have failed to meet their burden of establishing

53

their affirmative defenses at this procedural juncture in any event and consequently are not entitled to relief.   The court alludes to this evidence only to illustrate the type of factual issues subject to dispute which preclude the court from granting the ONEOK defendants' Rule 12(b)(6) motion and demonstrate why these arguments would be more appropriately raised by way of a motion for summary judgment.[17]

### B.   Equitable Estoppel

The ONEOK defendants' first argument in favor of dismissal is based on equitable estoppel.   They contend that Farmland's claims against them pre-date the bankruptcy case (presumably under the theory that they arose upon Texaco's termination of the pipeline lease with Mid-America in 2001) and were not disclosed in Farmland's bankruptcy schedules, disclosure statement, or reorganization plan.   In support of this argument, the ONEOK defendants rely on *Hay v. First Interstate Bank, N.A.*, 978 F.2d 555 (9th Cir. 1992), and *Oneida Motor Freight, Inc. v. United Jersey Bank*, 848 F.2d 414 (3d Cir. 1988).   Certainly, these cases stand for the proposition that a debtor **can** be equitably estopped, in appropriate

---

[17] The court further wishes to convey that it is unimpressed with the ONEOK defendants' criticism of Farmland for presenting matters beyond the pleadings and raising various factual arguments in response to the ONEOK defendants' motion.   The manner in which Farmland responded to the motion is understandable given the fact that the motion seeks dismissal on the basis of affirmative defenses by relying on matters beyond the pleadings.   This court has discretion whether to take judicial notice, and therefore Farmland was faced with the risk that the court might consider these documents and convert the motion to one for summary judgment instead of taking judicial notice of them.   Thus, Farmland's response, which includes facts beyond the pleadings, was not at all imprudent.   Instead, it was attributable to the fact that the ONEOK defendants are really trying to accomplish things on a Rule 12(b)(6) motion which present factual issues more appropriate for resolution on a motion for summary judgment or at trial.

circumstances, from later asserting claims in a non-bankruptcy forum if the debtor fails to give notice of the claim in the bankruptcy proceedings. But, these cases do not announce a per se rule that all such undisclosed claims are necessarily barred. The case must present facts and circumstances that warrant application of equitable estoppel.

The doctrine of equitable estoppel "prevent[s] a party from taking a legal position inconsistent with an earlier statement or action that places his adversary at a disadvantage." *Spaulding v. United Transp. Union*, 279 F.3d 901, 909 (10th Cir. 2002) (quotation omitted; brackets in original). The elements of such a claim are as follows:

> (1) the party to be estopped must know the facts; (2) the party to be estopped must intend that his conduct will be acted upon or must so act that the party asserting the estoppel has the right to believe that it was so intended; (3) the party asserting the estoppel must be ignorant of the true facts; and (4) the party asserting the estoppel must rely on the other party's conduct to his injury.

*Id.* Furthermore, "mere reliance is not enough—such reliance on an adversary's misrepresentations must have been reasonable in that the party claiming the estoppel did not know nor should it have known that its adversary's conduct was misleading." *Id.* (quotation omitted).

Here, the allegations in Farmland's complaint combined with the information the ONEOK defendants have submitted from the bankruptcy proceedings fails to persuade the court that Farmland can prove no set of facts under which it could overcome the ONEOK defendants' claim that Farmland is equitably estopped from asserting its claims against the ONEOK defendants. The allegations in Farmland's complaint and the bankruptcy records do not establish that the position Farmland took is inconsistent with the position that it is now

taking.   Farmland disclosed the existence of pending litigation at the KCC against Mid-America, Williams, "and others" and it preserved the trustee's right to pursue "present and future" litigation claims, whether known or unknown.   The record also does not reveal the extent to which Farmland (the party to be estopped) knew the facts upon which its claim is based during the process of confirmation of its reorganization plan.   The record also does not reveal that the ONEOK defendants were ignorant of the true facts (as alleged) inasmuch as they knew that Farmland had instituted proceedings before the KCC surrounding Mid-America's abandonment of the Texaco pipeline because the ONEOK defendants became a part of those proceedings in 1993.   And, most obviously, the ONEOK defendants have made no showing whatsoever that they relied to their detriment on Farmland's alleged failure to disclose its claim against them.   In sum, then, the ONEOK defendants have not demonstrated that they are entitled to application of the doctrine of equitable estoppel at this procedural juncture.

### C.      Judicial Estoppel

The ONEOK defendants' judicial estoppel argument meets with the same fate.   Again, they have cited case law which supports the notion that a debtor **can** be judicially estopped, in appropriate circumstances, from later asserting claims in a non-bankruptcy forum if the debtor fails to give notice of the claim in the bankruptcy proceedings.   *See Ryan Operations G.P. v. Santiam-Midwest Lumber Co.*, 81 F.3d 355 (3d Cir. 1996); *Payless Wholesale Distribs., Inc. v. Alberto Culver (P.R.) Inc.*, 989 F.2d 570 (1st Cir. 1993); *Oneida Motor Freight*, 848 F.2d at 419.   But, again, these cases do not announce a per se rule barring all claims that are not

disclosed in bankruptcy.   The case must present facts and circumstances that warrant application of the doctrine.

Judicial estoppel provides that "[w]here a party assumes a certain position in a legal proceeding, and succeeds in maintaining his position, he may not thereafter, simply because his interests have changed, assume a contrary position, especially if it be to the prejudice of the party who has acquiesced in the position formerly taken by him." *Johnson v. Lindon City Corp.*, 405 F.3d 1065, 1069 (10th Cir. 2005).[18]   In determining whether to apply judicial estoppel, the court should consider whether (1) the party's later position is clearly inconsistent with its earlier position; (2) the party has succeeded in persuading the court to accept that party's earlier position; and (3) the party seeking to assert the inconsistent position would derive an unfair advantage or impose unfair detriment on the opposing party if not estopped. *Id.*

In this case, the allegations in Farmland's complaint combined with the records submitted to the court from the bankruptcy proceedings do not show beyond a doubt that the ONEOK defendants are entitled to relief on this theory.   The fact that Farmland is now asserting claims against the ONEOK defendant is not necessarily inconsistent with its stance from the bankruptcy proceedings.   Again, Farmland noted the pending KCC proceedings against Mid-America, Williams, "and others."      Additionally, its disclosure statement and

_____

[18] Until 2005, the Tenth Circuit had entirely rejected the doctrine of judicial estoppel. *See, e.g.*, *NISH v. Rumsfeld*, 348 F.3d 1263, 1272 (10th Cir. 2003). In *Johnson v. Lindon City Corp.*, the Tenth Circuit first applied the principle of judicial estoppel based on intervening Supreme Court precedent. 405 F.3d at 1068-69.

reorganization plan stated that the liquidating trustee would be vested with authority to pursue present and future litigation claims, both known and unknown.  To the extent that Farmland may have failed to disclose those claims, it does not appear from the current record that Farmland gained any unfair advantage from failing to do so inasmuch as it appears that the size of the claim of the only ONEOK defendant in this case who was also a creditor in the bankruptcy proceedings (ONGL) was undoubtedly minuscule in the scope of the Farmland bankruptcy. Thus, it is doubtful that ONGL's vote would have had much impact on approval of the reorganization plan.  And, again, the ONEOK defendants have made no showing that they relied to their detriment on Farmland's alleged failure to disclose its claim against then.  In sum, then, the ONEOK defendants have not demonstrated that they are entitled to application of the doctrine of judicial estoppel at this procedural juncture.

### D.   Res Judicata

Lastly, the ONEOK defendants contend that Farmland's claims against them are barred by res judicata because Farmland failed to commence or properly reserve its claims against them prior to the bankruptcy court's entry of the confirmation order.   A bankruptcy court's order of confirmation is treated as a final judgment with res judicata effect.  *Stoll v. Gottlieb*, 305 U.S. 165, 170-71 (1938).  Pursuant to 11 U.S.C. § 1141(a), all parties are bound by the terms of a confirmed plan of reorganization.   Consequently, parties or their privies may be precluded from raising claims that could have or should have been raised before confirmation of a bankruptcy plan but failed to do so. *See generally Browning v. Levy*, 283 F.3d 761 (6th Cir. 2002); *D & K Properties Crystal Lake v. Mutual Life Ins. Co.*, 112 F.3d 257, 259-60

(7th Cir. 1997).  Res judicata is an affirmative defense on which the defendant has the burden to set forth facts sufficient to satisfy the elements.  *Nwosun v. Gen. Mills Restaurants, Inc.*, 124 F.3d 1255, 1257 (10th Cir. 1997).  It requires that four elements be satisfied: "(1) the prior suit must have ended with a judgment on the merits; (2) the parties must be identical or in privity; (3) the suit must be based on the same cause of action; and (4) the plaintiff must have had a full and fair opportunity to litigate the claim in the prior suit."  *Id.*  Here, the ONEOK defendants' res judicata argument fails at this procedural juncture because the allegations in Farmland's complaint combined with the public records from the bankruptcy court do not reveal that it appears beyond a doubt that the criteria for application of res judicata is necessarily satisfied.  In particular, the record does not conclusively reveal the extent to which Farmland knew about the details of the ONEOK defendants' involvement with the pipeline during the relevant time period and, consequently, it is unclear whether Farmland could have asserted claims against the ONEOK defendants prior to plan confirmation.[19]

More importantly, though, § 1123(b)(3)(B) of the Bankruptcy Code states that a confirmation plan may provide for "the retention and enforcement by the debtor, by the trustee, or by a representative of the estate appointed for such purpose of any claim or interest."  In this case, the reorganization plan created a liquidating trustee (the plaintiff herein) to retain and

---

[19] The court also is not necessarily persuaded that the second res judicata element is satisfied with respect to ONEOK and OFSC because they were not creditors of the estate and thus presumably would not have participated in the plan confirmation proceeding.  *See First Union Commercial Corp. v. Nelson, Mullins, Riley & Scarborough (In re Varat Enters.)*, 81 F.3d 1310, 1316 n.6 (4th Cir. 1996) ("A party for purposes of former adjudication includes one who participates in a Chapter 11 plan confirmation proceeding.").

enforce the claims now asserted against the ONEOK defendants.  The plan gave plaintiff the exclusive right to enforce any and all **present or future** Litigation Claims."  And, it defined "Litigation Claims" as "claims, rights, causes of action, defenses, counterclaims, suits or proceedings, whether in law or in equity, **whether known or unknown**, that the Debtors, the Estates, or the Bankruptcy Committees may hold or assert against any non-Debtor Entity."  The plain language of the plan, then, allows plaintiff to retain and enforce all claims and causes of actions that Farmland held or asserted against a non-Debtor entity, i.e., the ONEOK defendants. The issue of when Farmland's claim against the ONEOK defendants arose ("present or future") is of no consequence, nor is the extent to which Farmland knew about those claims ("whether known or unknown") at the time that the bankruptcy court entered the order confirming the plan.

The ONEOK defendants contend that such a general reservation of rights provision is insufficient to preserve Farmland's claims against them.  In support of this argument, they rely on the appellate-level cases of *Browning v. Levy*, 283 F.3d 761 (6th Cir. 2002), and *D & K Properties Crystal Lake v. Mutual Life Ins. Co.*, 112 F.3d 257 (7th Cir. 1997).  In both of those cases, the courts held that a blanket reservation was insufficient to preserve the subject claims from the res judicata effect of the bankruptcy court's confirmation order.  But the reservation clause at issue in this case is distinguishable in the sense that the reservation clauses in those cases were of a much more general nature.  For example, in *D & K Properties*, the reservation clause provided that the disbursing agent "shall enforce all causes of action

existing in favor of the Debtor." 112 F.3d at 259. In *Browning*, the reservation clause stated as follows:

> In accordance with section 1123(b) of the Bankruptcy Code, the Company shall retain and may enforce any claims, rights, and causes of action that the Debtor or its bankruptcy estate may hold against any person or entity, including, without limitation, claims and causes of action arising under section 542, 543, 544, 547, 548, 550 or 553 of the Bankruptcy Code.

283 F.3d at 774-75. The court further pointed out that "[s]ignificantly, it neither names [the defendant] nor states the factual basis for the reserved claims." *Id.* at 775.

By comparison, in *Fleet National Bank v. Gray ex rel. Bankvest Capital Corp. (In re Bankvest Capital Corp.)*, 375 F.3d 51 (1st Cir. 2004), the First Circuit held that a provision giving the liquidating supervisor authority to "investigate, prosecute and, if necessary, litigate, any Cause of Action [the definition of which expressly includes avoidance actions] . . . on behalf of the Debtor and shall have standing as an Estate representative to pursue any Causes of Action and Claim objections" and which did not specifically mention the particular avoidance claim at issue was nonetheless sufficient to preserve the right to pursue the claim because the plan contained specific and unequivocal language that retained claims of that type. *Id.* at 59. Also, in *P.A. Bergner & Co. v. Bank One, Milwaukee, N.A. (In re P.A. Bergner & Co.)*, 140 F.3d 1111 (7th Cir. 1998), the reservation clause provided as follows:

> Effective as of the date of the approval of the Disclosure Statement by the Bankruptcy Court, the Debtors waive the right to prosecute and release any avoidance or recovery actions under sections 544, 545, 547, 548, 549, 550, 551, and 553 of the Bankruptcy Code or any other causes of action, or rights to payments of claims, that belong to the Debtors . . . other than any such actions that may be pending on such date.

*Id.* at 1117.  At the time of plan confirmation, the debtor had been prosecuting its case against the defendant for over fourteen months and discovery continued after confirmation "with not a peep" from the defendant.  *Id.*  The Seventh Circuit held that this language preserved the debtor's claim against the defendant, reasoning that "[t]he courts that have spoken of the need for 'specific' and 'unequivocal' language have focused on the requirement that plans unequivocally retain claims of a given type, not on any rule that individuals claims must be listed specifically."  *Id.*  In that case, the plan language "provided all the notice to which [the defendant] was entitled under the statute to preserve the ongoing proceeding between the parties." *Id.*[20]

In this case, the reservation clause at issue is more specific than those at issue in either *Browning* or *D & K Properties* and is more akin to those at issue in *Fleet National Bank* and *P.A. Bergner & Co.*  It states as follows:

> the Liquidating Trustee . . . will, pursuant to section 1123(b)(3)(B) of the Bankruptcy Code, retain and become the holder of, and have the exclusive right

---

[20] The court is unpersuaded by the ONEOK defendants' reliance on *Harstad v. First Am. Bank (In re Harstad)*, 39 F.3d 898 (8th Cir. 1994), for the proposition that a reservation clause may preserve a claim only if "specific and unequivocal" retention language is used.  *Id.* at 902.  The issue in *Harstad* was whether language in the confirmation plan conferred standing on the debtors to bring the claim post-confirmation.  *Id.*  In contrast, in this case, no party disputes that the confirmation plan gives plaintiff, as the liquidating trustee, standing to pursue claims.  Rather, the issue here is whether the particular claims at issue were reserved. Nonetheless, the "specific" and "unequivocal" language used by the Eighth Circuit in *Harstad* in addressing this particular issue is consistent with the other cases which have addressed the issue of whether a confirmation plan reserved a particular type of claim.  *Cf. Retail Mktg. Co. v. King (In re Mako, Inc.)*, 985 F.2d 1052, 1055-56 (10th Cir. 1993) (nondebtor, nontrustee party, could not institute postconfirmation avoidance proceedings as "representative" of Chapter 11 estate because it did not have clear authority under the Chapter 11 plan to do so).

> to enforce any and all present or future Litigation Claims and any and all rights of any and all of the Debtors that arose before or after the Commencement Date, including, but not limited to, rights, claims, causes of action, avoiding powers, suits and proceedings arising under Chapter 5 of the Bankruptcy Code, including, without limitation, any and all potential rights, claims and causes of action related to payments made by the Debtors prior to the Petition Date and Disclosed in the Schedules.

Debtors' Second Amended Joint Plan of Reorganization Plan, as Modified § 5.10(a), at 28.

Additionally, it defines "Litigation Claims" broadly as

> the claims, rights, causes of action, defenses, counterclaims, suits or proceedings, whether in law or in equity, whether known or unknown, that the Debtors, the Estates or the Bankruptcy Committees may hold or assert against any non-Debtor entity, including, without limitation, all claims, rights of action, suits and proceedings under Chapter 5 of the Bankruptcy Code; provided, however, that "Litigation Claims" shall not include any Industries Retained Assets or Transferred Assets.

*Id*. § 1.80, at 8.   Thus, in this case the reservation clause, combined with the definition of "Litigation Claims," specifically and unequivocally reserved the type of claims asserted by plaintiff in this case against the ONEOK defendants—i.e., claims and causes of action that Farmland holds and asserts against them.   If that were not enough, in addition the disclosure statement explains that "[t]he nature of the Debtors' businesses is such that they are routinely involved in litigation."   Disclosure Statement for Debtors' Second Amended Joint Plan of Reorganization, as Modified § III(I)(8), at 33.   Under the captions "Pending Litigation and Automatic Stay," "Known Claims Against Third Parties," it states:

> The Debtors currently hold certain claims or rights of action against a number of parties and continue to review claims against certain parties that may ripen into litigation. **Neither the listing nor the failure to list any party herein shall prejudice the Debtors' rights to pursue any claims, rights of action or proceedings that have arisen or may arise in the future in the**

> **ordinary course of the Debtors' businesses.** Known claims or rights of action against third parties include, without limitation, the following . . .
>
> . . . .
>
> (5) The Debtors have filed a complaint with the Kansas Corporation Commission against Mid-America Pipeline Company, The Williams Companies **and others** regarding violations of the regulations governing utilities and common carriers.

*Id.* § III(I)(8)(c) (emphasis added). At the time, ONEOK, Inc. was involved in the KCC proceedings. Collectively, the court believes, these provisions were sufficient to give ONGL the notice to which it was entitled, as a creditor of the estate entitled to vote on confirmation of the reorganization plan, in order to preserve Farmland's claims under the ONEOK defendants. *See, e.g., Katz v. I.A. Alliance Corp. (In re I. Appel Corp.)*, 300 B.R. 564, 570 (S.D.N.Y. 2003) (general reservation of "all rights to any claims or causes of action" combined disclosure statement indicating that debtor was investigating potential claims against the defendants was sufficient to preserve claims against the defendants); *Buckley v. Goldman, Sachs & Co.*, Case No. 02-11497, 2005 WL 1206865 (D. Mass. May 20, 2005) (general reservation combined with disclosure statement revealing potential claims against the defendants was sufficient to preserve claims against the defendants).

At oral argument, the ONEOK defendants argued that the court should require a greater degree of specificity in the plan language in order to preserve a non-bankruptcy claim of this size (potentially, $30 million) rather than a garden variety preference or avoidance action, which are more commonplace and numerous in bankruptcy litigation. This argument finds no support in the plain language of the applicable statute which simply provides for the retention or enforcement of "any claim or interest," without making any distinction between the degree

of specificity required in order to preserve particular types of claims. Furthermore, no such dichotomy is supported by the purpose of the statute. Section 1123(b)(3) is, "at least in part, a notice provision. Creditors have the right to know of any potential causes of action that might enlarge the estate-and that could be used to increase payment to the creditors." *Harstad*, 39 F.3d at 903. In this case, the disclosure statement and the reorganization plan clearly attempted to cast as broad of a net as possible to preserve claims in order to maximize the value of the estate and, consequently, the amounts that ultimately will be paid to creditors. The disclosure statement broadly acknowledged that various claims arise in Farmland's ordinary course of business and that some of the claims that Farmland held against certain parties could ripen into litigation. It even listed the proceedings before the KCC of which the ONEOK defendants were a part. Additionally, the plan of reorganization created a liquidating trustee specifically for the purpose of pursuing a broad variety of claims, expressly including the type of "Litigation Claims" which are the subject of this litigation. In voting on plan confirmation, the creditors of the estate undoubtedly relied on the broad power given to the liquidating trustee to pursue such claims. The court sees no sound reason to require a greater degree of specificity than that which was provided in the disclosure statement and plan of reorganization simply because of the type of claim against the ONEOK defendants and its potentially significant value. To the contrary, during the plan confirmation proceedings the creditors of the estate were entitled to rely on the liquidating trustee's power to pursue such claims. Thus, the court rejects the ONEOK defendants' suggestion that more specificity was required. Accordingly, their motion to dismiss is denied.

**V.      Farmland's Request to File an Amended Complaint**

At oral argument, Farmland requested leave to file an amended complaint correcting some of the pleading deficiencies discussed in this Memorandum and Order.   For example, Farmland indicated that it wished to amend its complaint to properly allege a third-party beneficiary theory against Mid-America and to properly allege liability on the part of Williams.    The court cannot say that these proposed amendments would be futile.    Thus, consistent with the liberal policy in favor of granting leave to amend the pleadings, *see* Fed. R. Civ. P. 15(a) (leave to amend shall be freely given when justice so requires), to the extent that the court is granting defendants' motion to dismiss, it is doing so without prejudice to Farmland filing an amended complaint no later than **February 17, 2006**, which corrects any of the pleading deficiencies noted herein.

If Farmland files an amended complaint, defendants of course may once again file motions to dismiss challenging the sufficiency of those allegations.    In doing so, defendants should not reassert arguments that the court has already definitively rejected at the pleading stage in this Memorandum and Order.    Their failure to renew any such arguments will not be deemed a waiver of those arguments because the court has already rejected them.    If defendants elect to file any such motions, they should direct their arguments at allegations that Farmland newly asserts in its amended complaint.

**IT IS THEREFORE ORDERED BY THE COURT** that Mid-America Pipeline Company, LLC's Motion to Dismiss Mid-America Pipeline Company ("MAPCO") (Doc. 14)

66

is denied; Mid-America Pipeline Company, LLC's Motion to Dismiss Mid-America Pipeline Company, LLC ("MAPL") (Doc. 11) is granted in part and denied in part as set forth above; the Motion to Dismiss by Defendant Williams Energy Services (Doc. 16) is granted without prejudice to Farmland seeking leave to amend its complaint to re-assert these claims, if it wishes to do so; and the ONEOK Defendants' Motion to Dismiss (Doc. 19) is denied.

**IT IS FURTHER ORDERED** that to the extent that the court is granting defendants' motions, it is doing so without prejudice to plaintiff filing an amended complaint no later than **February 17, 2006**, which corrects any of the pleading deficiencies noted herein.

**IT IS SO ORDERED** this 7th day of February, 2006.

s/ John W. Lungstrum
John W. Lungstrum
United States District Judge

67